T.C. Memo. 1998-92


UNITED STATES TAX COURT


NICK AND HELEN KIKALOS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10244-96.                    Filed March 3, 1998.


<u>George Brode, Jr.</u> and <u>John J. Morrison</u>, for petitioners.

<u>Ronald T. Jordan</u> and <u>Timothy A. Lohrstorfer</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CLAPP, <u>Judge</u>:  Respondent determined the following deficiencies and accuracy-related penalties in petitioners' Federal income taxes:

| Year | Deficiency | Accuracy-related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1990 | $686,872 | $137,374 |
| 1991 | 805,093 | 161,019 |
| 1992 | 818,901 | 163,780 |

The issues for decision are:

(1)  Whether petitioners maintained inadequate records of income in the years 1990, 1991, and 1992, justifying the use of an indirect method of reconstructing income.  We hold that they did not maintain adequate records.

(2)  Whether respondent's use of the percentage markup method of reconstructing petitioners' income for the years 1990, 1991, and 1992 was reasonable.  We hold that it was.

(3)  Whether petitioners have shown that respondent's determinations as to their unreported income were incorrect.  We hold that they have, to the extent set forth herein.

(4)  Whether petitioners incurred a deductible theft loss in the amount of $19,769 in the taxable year 1991.  We hold that they did not.

(5)  Whether petitioners may deduct as a trade or business expense in the taxable year 1992 an interest payment of $393,024 made in connection with their liability for deficiencies in income taxes for their taxable years 1986 and 1987.  We hold that they may.

(6)  Whether petitioners are liable for an accuracy-related penalty under section 6662(a) for each of the taxable years 1990, 1991, and 1992.  We hold that they are.[1]

---

[1]    Petitioners have not disputed other issues set forth in the notice of deficiency, and we consider those issues to be conceded.  Those issues relate to the disallowance of an expense of $3,060 for two cash registers; the disallowance of

(continued...)

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. We incorporate by reference the stipulation of facts, the three supplemental stipulations of facts, and attached exhibits.

Petitioners are husband and wife, who resided in Hammond, Indiana, when the petition in this case was filed. Petitioner Nick Kikalos (Nick) was born in Greece in 1935 and came to the United States in 1936. He completed school through the eighth grade. Since 1971, Nick has operated Nick's Liquors, a cigarette, beer, and liquor store business, as a sole proprietorship. During the years in issue, Nick's Liquors operated in three separate store locations in Hammond: 4702 Calumet Avenue (store No. 1), 5705 Hohman Avenue (store No. 2), and 6914 Indianapolis Boulevard (store No. 3). All three stores had storage areas, and two of them had warehouse facilities.

A. Petitioners' Gross Profit Margins

Nick maintained his office at store No. 1, and his wife, Helen Kikalos (Helen), worked there for several hours each

---

[1](...continued)
depreciation expenses of $39,301, $38,581, and $33,514 for the respective years in issue; and the disallowance of a loss of $9,707 on the sale of a rental house.

morning. Nick Kikalos, Jr. (Nick, Jr.) managed store No. 2, and petitioners' daughter, Liz Lukowski (Liz), managed store No. 3.

Petitioners computed their income using the cash receipts and disbursements method. Every business day, Nick made entries of income and expenses on bound, sequentially paged ledgers for each of his three stores. Nick maintained a separate checking account for each of the three stores and an additional "lotto" account, which he maintained as a fiduciary for the State of Indiana. Nick did not account for the lotto receipts directly. Instead, he funded the account twice a week from the daily proceeds of store No. 3. Keeping strict lotto accounts, he reported, would be a "big pain." The State of Indiana obtained its funds from the lotto account by means of electronic fund transfers.

There was one cash register in each of the stores. Despite advice that he do so, Nick did not retain the receipts or daily summaries produced by the cash registers during the years in issue.

Nick dealt substantially in cash. All sales were in cash; credit cards were not accepted, and personal checks were rarely taken. Customers could, however, pay for part of their cigarette purchases with manufacturers' coupons. These took two forms: "Physical" coupons, which Nick would send to the manufacturers for redemption, and "buy down" coupons, for which the manufacturers paid Nick directly. Petitioners' employees rang up

coupons for cigarette discounts on a separate cash register key.

Nick, Jr. was in charge of beer purchases for the three stores. His practice was to buy beer in the highest possible quantities to obtain the lowest prices from his suppliers. Liz was in charge of buying the stores' wine and liquor inventories. Her suppliers regarded her as a very astute buyer. The manager of a store would pay beer and liquor wholesalers with checks. The manager paid other suppliers in cash, placing the receipts in a "bill bag." In each of the stores, the manager also took cash register readings at the end of a shift. The stores' cash registers summarized the day's results on a "Z tape." The "Z tapes", the receipts and other materials, such as paid lottery tickets and cigarette coupons, all went into the bill bag at each store. Cash was placed in a "drop safe" by the cash register periodically during the day and at the end of each day. Before opening the next business day, a family member, Nick, Helen, Nick, Jr., or Liz, would count the cash in the drop safe, retain enough for the day's business at each store, and prepare a deposit slip for the balance. Usually, Helen deposited the excess cash in the bank. A copy of the deposit slip was put into the bill bag. The bill bags containing records of receipts and expenses went to Nick at his office at store No. 1.

Not all the excess cash went to the bank. In order to meet the payroll and other expenses, Nick would ask Liz for cash, or he would retain cash from store operations himself. Nick also

retained some of the cash for his personal use. Nick did not record the amounts he kept for himself in his ledger books. Petitioners did not maintain a personal checking account.

During 1990, 1991, and 1992, petitioners' stores sold beer by the case (both 24-can and bottle cases and 30-can and bottle cases), multiple cases, 12-packs, 6-packs, 40-ounce bottles and cases, 32-ounce bottles and cases, and half-barrel and quarter-barrel sizes. Nick's Liquors also sold single 12- and 16-ounce cans of beer. All three stores sold warm beer from the floor and cold beer from large coolers in each store. Nick's Liquors sold liquor in cases and individual bottles in a variety of sizes, ranging from 1.75 liter (L), 1 L, 750 milliliters (mL), 375 mL, 200 mL, down to 50-milliliter miniatures. Nick's Liquors also sold wine, both warm and cold, in a variety of sizes and sold cigarettes by the 30-carton case, by the 10-pack carton, by multiple cartons, and by the pack.

In general, petitioners' profit margins were larger on sales of the smaller sizes, whether they were sales of beer, liquor, or cigarettes. For example, cigarettes sold by the pack were marked up by an additional nickel per pack from their carton price. Petitioners also sold cold beer from their stores' large coolers at a higher price than warm beer.

Nick's Liquors was a high-volume, low-priced retail operation. It was Nick's Liquors' practice to sell a high volume of a limited number of brands and sizes of beer and liquor at low

prices. Nick's Liquors advertised itself as a discount liquor dealer. Its consistent goal was to maintain the lowest prices in the area. It maintained the warehouse facility at store No. 1 primarily to house large-volume purchases of beer and liquor. The warehouse was capable of accepting full truckloads and pallets of beer. Petitioners were frequently able to buy in such quantities to take advantage of quantity discounts and of discounts in periodically issued "deal sheets" from the wholesalers.

Nick's Liquors operated in a highly competitive environment. Petitioners' stores were near the Illinois border and the city of Chicago. Because of differences in State taxes, cigarettes sold for considerably less in Indiana than in Illinois during the years in issue. Liquor, on the other hand, was generally cheaper in Illinois. Nick and his family tried to keep prices low, not only to compete for the Illinois cross-border cigarette business, but also to keep Indiana beer and liquor customers from making their purchases in Illinois.

Nick's Liquors ran weekly advertisements in the local newspaper, the Hammond Times. The advertised prices reflected an average gross profit margin of 6.31 percent in 1990, 6.52 percent in 1991, and 6.06 percent in 1992. Many of the ads were small, single-item "rate holder" ads. The heaviest advertising took place in December, when Nick's Liquors advertised many more items than usual. Except for the month of December, the advertised

sales prices were limited to a duration of 1 week. In the December advertisements, the sales ended December 31, or "while supplies last". Nick's Liquors also held "in-store" sales for items that did not appear in the newspaper ads. In some instances, petitioners' personnel kept items on sale beyond the period indicated. Additionally, there were "perma sales" of items that went on sale and retained the sale price indefinitely.

Nick's Liquors also sold merchandise that was not on sale and produced substantially higher profit margins. For example, in September of 1991, it sold "Old Style" beer at a price of $9.98 per case, which represented a margin of 15.8 percent, based upon the wholesale cost of $8.40 per case. Nick's Liquors sold 750-milliliter bottles of Riunite wine for $3.99, a margin of 26.1 percent. One-liter bottles of Jack Daniels whiskey sold at a margin of 17 percent, and 750-milliliter bottles of Andre Pink Champagne sold at a margin of 22.8 percent.

Petitioners' competitors in northwest Indiana had a markup on warm beer, sold by the case, of 5 to 6 percent. The competitors maintained a gross profit margin of 7 to 13 percent on liquor, although the margin would be higher for slower-moving items. The price of beer remained fairly stable during the years in issue, and profits ranged between $.10 and $1.00 on a case for warm beer. Although Nick's Liquors' margins on some merchandise was as high as 26 percent, those margins were an exception to the general rule of substantially lower margins.

Other liquor stores in northern Indiana had an average margin in the range of 25 percent, but those stores did not operate with the low-price, high-volume philosophy of petitioners' stores.

Nick's Liquors' cigarette pricing stayed the same between 1990 and 1994.  In 1994, a competitor sued Nick in an Indiana court, alleging that Nick sold cigarettes at such low prices that he had violated Indiana's Unfair Practices Act.  Indiana law required cigarette profits to equal or exceed an 8-percent addition to the retailers' cost, as a "retail cost of doing business".  Indiana statutes provided an exception, however, that permitted a retailer to sell cigarettes below this 8-percent addition in order to meet competition, as long as the retailer sold the cigarettes above the retailer's own cost.  Ind. Code Ann. sec. 24-3-2-7 (Michie 1996).  The Indiana court found that Nick's Liquors qualified for this exception.

In connection with that litigation, petitioners presented the evidence of an accountant, who calculated Nick's Liquors' gross profit margins on cigarette sales in August and December of 1994.  The average margin for August of brand-name cigarettes was 6.67 percent, and its margin for generic cigarettes was 6.39 percent.  For December the average margin of brand-name cigarettes was 2.92 percent, and its margin for generic cigarettes was 2.57 percent.  These very low margins for December reflected the existence of the price war that caused petitioners'

competitor to bring a lawsuit. In general, the competition was such that petitioners' competitors could expect profits of between $.10 and $1 per carton. Competitors who were some miles away from the Illinois border marked up their cigarettes by 10 to 15 percent.

Petitioners' Federal income tax returns for the years in issue were prepared by professional accountants, based upon information furnished them. The accountants did not conduct an audit of petitioners' business activities, nor did they establish other inventory or cash controls.

For the years in issue, petitioners' Federal income tax returns reported gross sales from Nick's Liquors ranging between $8,535,458 and $9,054,086 per year. These returns reported taxable income from operations of $500,698 for 1990, $543,245 for 1991, and $531,549 for 1992. In each instance, the amounts reported represented gross margins on sales of approximately 6 percent. Respondent determined that petitioners had understated their taxable income. Respondent accordingly redetermined petitioners' income for the years in issue by utilizing the "percentage markup method". Respondent's method results in application of gross profit margins of approximately 26.8 percent for the years in issue. Respondent based that redetermination on margins in a report entitled, "Estimated Gross Margin as Percent of Sales, by Kinds of Business", printed in the Combined Annual and Revised Monthly Retail Trade reports issued by the U.S.

Department of Commerce.

During each of the years in issue, beer represented 42 percent of petitioners' purchases of inventory, in terms of dollars spent. Wine and liquor represented 22 percent of purchases, and cigarettes represented another 33 percent. Miscellaneous items, such as soda and snacks, represented the remaining 3 percent. During those years, petitioners' sales in each of those categories took place in the same proportions. Petitioners' weighted gross profit margin for all products for the years in issue was 10.54 percent. This is equivalent to a markup on cost of goods sold of 11.78 percent.

B. Petitioners' Theft Loss Deduction

On October 25, 1991, store No. 1 was robbed. Some $22,773 was stolen, consisting of daily receipts, lottery tickets, cash on hand, beer deposits, sales taxes, lotto machine cash, and lotto daily cash. Petitioners' logbook entry for that date does not contain an entry for the amount of the day's sales receipts. Instead, the logbook contains the following entry: "Robbed 10-25-91". Petitioners deducted $22,773 as a theft loss deduction on their Federal income tax return for 1991. Respondent disallowed petitioners' theft loss deduction in the amount of $19,769. Respondent allowed a deduction of the remaining $3,004 of the amount stolen. The amount allowed consisted of $1,750 for the cost of lottery tickets, $166 as beer deposits, $695 as lotto machine cash, and $393 as lotto daily

cash.

C.  Petitioners' Interest Deduction

On or about February 10, 1992, respondent assessed petitioners additional income tax of $286,147.50 for their 1986 tax year and $272,146 for their 1987 tax year.  The assessments for 1986 and 1987 resulted from respondent's increase in petitioners' reported gross business profit for those years, based upon respondent's use of a bank deposits analysis.  In 1992, petitioners paid $393,024 in interest on the additional amounts assessed for 1986 and 1987.  Petitioners deducted the amount of the interest payment on their 1992 Federal income tax return.  Respondent disallowed that deduction of $393,024.

OPINION

I.  Petitioners' Records of Income

Taxpayers must maintain accounting records which enable them to file correct income tax returns.  Sec. 6001; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Section 6001 provides:

> SEC. 6001. NOTICE OR REGULATIONS REQUIRING RECORDS,
>           STATEMENTS, AND SPECIAL RETURNS.
>
> Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. * * *

In this regard, section 1.446-1(a)(4), Income Tax Regs., provides in part:

> Each taxpayer is required to make a return of his

taxable income for each taxable year and must maintain such accounting records as will enable him to file a correct return. See section 6001 and the regulations thereunder. Accounting records include the taxpayer's regular books of account and such other records and data as may be necessary to support the entries on his books of account and on his return * * *"

Respondent's determination of taxable income is presumptively correct. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Mendelson v. Commissioner, 305 F.2d 519, 522 (7th Cir. 1962), affg. T.C. Memo. 1961-319.

Where a taxpayer fails to maintain or produce adequate books and records, the Commissioner is authorized to compute the taxpayer's taxable income by any method which, in the Commissioner's opinion, clearly reflects the taxpayer's income. Sec. 446(b); Holland v. United States, 348 U.S. 121, 134 (1954); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Harbin v. Commissioner, 40 T.C. 373, 377 (1963). The Commissioner's method need not be exact but must only be reasonable in light of the surrounding facts and circumstances. Holland v. United States, supra; Rowell v. Commissioner, 884 F.2d 1085, 1087 (8th Cir. 1989), affg. T.C. Memo. 1988-410; Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).

Here, the principal issue is the amount of petitioners' gross income for the years in issue. Petitioners' bookkeeping practices have failed to produce "such other records and data as may be necessary to support the entries on his books of account

and on his return".  Sec. 1.446-(1)(a)(4), Income Tax Regs.  In this case, Nick alone controlled and prepared the books.  He did not retain copies of the cash register tapes or other sales receipts, which were the only records that would substantiate the amount of petitioners' gross income.  Schwarzkopf v. Commissioner, 246 F.2d 731, 734 (3d Cir. 1957), affg. in part and remanding T.C. Memo. 1956-155.[2]

Petitioners argue that their bookkeeping practices accurately reflected their income.  They urge that respondent's methods of reconstructing that income have misstated the actual amounts.  Petitioners have overlooked the fact that their failure to retain the necessary records, particularly the cash register "Z tapes", precluded respondent from determining exactly what petitioners' income was for the years in issue.  In these circumstances, respondent is not required to make an exact determination.  All taxpayers, including petitioners here, who fail to maintain the records necessary to substantiate their assertions on their Federal income tax returns assume the risk that they may have to pay a tax based upon income that is not determined with certainty.  That is the fault of the taxpayers,

---

[2]  See also Edgmon v. Commissioner, T.C. Memo. 1993-486 (failure to retain register tapes, "Z-tapes" and bills); Votsis v. Commissioner, T.C. Memo. 1988-70 (failure to retain register tapes and sales receipts); Catalanotto v. Commissioner, T.C. Memo. 1984-215 (failure to retain register tapes and sales receipts).

however, and not of the Commissioner.  Mendelson v. Commissioner,
supra at 523.

## II.  Respondent's Use of the Percentage Markup Method

We must find petitioners' gross profit for each of the years
at issue.  Their gross profit is the difference between the price
at which petitioners sold their inventory and their cost of
purchasing that inventory.  Gross profit may be expressed in
terms of dollars, but gross profit is also often expressed in
terms of percentages--either "margin" or markup".  "Margin"
refers to gross profit as a percentage of the price at which
petitioners sold their inventory.  "Markup" refers to gross
profit as a percentage of the cost incurred by petitioners to
purchase that inventory.  Margin and markup are related terms,
and, if we know a specific example of one, we can determine the
other.  For example, a gross profit margin of 20 percent means
that the markup is 25 percent and vice versa.

In this case, respondent employed the "percentage markup"
method to determine that petitioners had underreported their
income.  In the proceeding before us, however, each side has
attempted to prove its case by demonstrating the profit margins
at which petitioners, or other retailers, sold their merchandise.
Because the parties have made their arguments in terms of profit
margins, we shall use that approach as well.

Here, because of petitioners' failure to retain records of

their gross receipts, respondent reasonably and justifiably determined the deficiencies at issue using Department of Commerce gross margin statistics as the basis for the deficiency determinations. In doing so, respondent employed a form of the percentage markup method. Under the percentage markup method, gross sales are determined by adding a predetermined percentage of cost of goods sold. Bernstein v. Commissioner, 267 F.2d 879, 880 (5th Cir. 1959), affg. T.C. Memo. 1956-260. The courts have consistently approved the use of the percentage markup method as an acceptable means of computing a taxpayer's income. Webb v. Commissioner, supra at 377; Bollella v. Commissioner, 374 F.2d 96 (6th Cir. 1967), affg. T.C. Memo. 1965-162.

Respondent's use of generalized statistics from Government reports is also permissible. There are longstanding acceptable methods of computing income that involve application of an objectively determined average that relates to the income-producing activity. See Avery v. Commissioner, 574 F.2d 467 (9th Cir. 1978) (approving the Commissioner's projection of taxpayer's income on the basis of isolated drug sales), affg. T.C. Memo. 1976-129; Cannon v. Commissioner, 533 F.2d 959 (5th Cir. 1976) (approving the Commissioner's assertion of deficiencies based upon an equal division of gambling proceeds between two gamblers when the contradictory testimony of each was unworthy of belief), affg. T.C. Memo. 1974-219; Bishoff v. Commissioner, 27 F.2d 91,

93 (3d Cir. 1928) (approving assertion of a deficiency based upon the Commissioner's "observation of earnings made and taxes paid by a corporation in a like business"), affg. 6 B.T.A. 570 (1927); Giddio v. Commissioner, supra at 1532 (approving determination of taxable income based upon Bureau of Labor Statistics report of average cost of raising a family in New York).[3]

III.  Petitioners' Evidence of Income

In this case, respondent had no quarrel with the amount of petitioners' costs or expenses of operating Nick's Liquors. Respondent's differences with petitioners instead involve the amount of their gross profit margins.  As we have held, petitioners have failed to show that respondent's determinations are arbitrary or unreasonable.  Accordingly, the presumption of correctness that attaches to respondent's determinations remains in force.  Harbin v. Commissioner, 40 T.C. 373, 376 (1963). Petitioners thus bear the burden of proving that respondent's determinations were erroneous.  To some extent, they have succeeded.  At trial, petitioners presented sufficient evidence

---

[3]     Our cases reflect a number of instances approving respondent's use of markup percentages based upon third-party sources to determine taxable income.  See, e.g., Estate of Shuman v. Commissioner, T.C. Memo. 1995-327 (use of gasoline station markups based upon publications of Department of Energy and Oil and Gas Journal plus competitors' prices); Biggs v. Commissioner, T.C. Memo. 1985-303 (use of percentage markup based upon advice of local plumbers' unions); Howse v. Commissioner, T.C. Memo. 1974-225 (use of percentage markup based upon reports of National Sporting Goods Association).

to show us that their profit margins were lower than the average margin figures reported in the Department of Commerce publications and used here by respondent.

Petitioners' contentions concerning their profit margins for the years in issue are founded principally upon an expert report prepared by Peter E. Rossi, Ph.D., Professor of Marketing, Econometrics, and Statistics at the Graduate School of Business, University of Chicago.

Expert opinion may or may not aid the Court in determining factual issues. See Laureys v. Commissioner, 92 T.C. 101, 129 (1989). We evaluate such opinions in light of the demonstrated qualifications of the expert and all other pertinent and credible evidence. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Parker v. Commissioner, 86 T.C. 547, 561 (1986); Johnson v. Commissioner, 85 T.C. 469, 477 (1985). We are not bound, however, by the opinion of any expert witness when that opinion is inconsistent with our considered judgment. Estate of Newhouse v. Commissioner, supra at 217; Parker v. Commissioner, supra at 561. We may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), and we also may be selective in the use of any portion thereof, Parker v. Commissioner, supra at 562. Consequently, we take into account expert opinion testimony here only to the extent that it aids us in arriving at petitioners'

likely profit margins for the years at issue.

Dr. Rossi examined Nick's Liquors' advertising and invoices, and he reviewed records of interviews with petitioners' competitors and suppliers. He analyzed data from Nick's Liquors' invoices. He also toured two of petitioners' stores and two stores of their competitors. He concluded that Nick's Liquors' margins on its sales were considerably less than the 27-percent average obtained from the Department of Commerce survey. Dr. Rossi based his determination on three factors: First, that Nick's Liquors' advertisements and invoices suggest profit margins of between 5 and 7 percent; second, that Nick's Liquors did not operate a representative retail liquor business because of Nick's Liquors' high-volume, low-priced operations; and, third, that Nick's Liquors' prices were kept low by the competitive retail environment of northwestern Indiana.

Dr. Rossi analyzed Nick's Liquors' likely profits by looking at its three major product lines: Beer, wine and liquor, and cigarettes. In the beer category, Dr. Rossi examined six highest selling brands, which accounted for 57 percent of beer sales. Based upon the newspaper advertisements, he determined that the average margin in beer was 5.99 percent. Dr. Rossi concluded that this margin did not apply only to infrequent "specials" but to Nick's Liquors' beer prices generally.

Dr. Rossi observed that Nick's Liquors' wine and liquor

margins were the most complicated category. He examined the top-volume items in this category, some eight brands or sizes of liquor and one of wine. These accounted for 17 percent of purchases. Dr. Rossi determined that the average margin on the advertised items was about 5 percent. As for the other 83 percent, the lower volume wines and liquors, Dr. Rossi estimated that Nick's Liquors' large-scale December ads were representative of the prices of at least 85 percent of this merchandise. The average margin on the December sale items was 7 percent. For the months other than December, Dr. Rossi opined that a "reasonable but still conservative" estimate of the margin upon these lower volume items was 14 percent. He concluded that, for wine and liquor sales overall, "we would get * * * approximately 11 percent".

With respect to cigarettes, Dr. Rossi noted that the advertised prices reflect margins of between 1 and 6 percent. He took into account the lawsuit in which the plaintiffs had charged Nick with unlawfully selling cigarettes below the State's mandated 8-percent addition to cost. Dr. Rossi determined ultimately that the margin "could not exceed 5 percent" and settled upon that figure.

Dr. Rossi concluded that a weighted average of the margins on beer, wine and liquor, and cigarettes produced a "conservative estimate" of an overall margin of 6.79 percent.

We have found Dr. Rossi's report helpful in a number of respects. The other evidence produced at trial regarding petitioners' prices for the years in issue is generally vague, anecdotal, and, because it often relates to years other than those in issue, somewhat irrelevant. Dr. Rossi's report provides a useful structure for obtaining a meaningful analysis of the information before us. In particular, we accept Dr. Rossi's division of petitioners' product lines into three categories; these divisions each display similar pricing and marketing characteristics. We also accept his estimation of each such category's percentage of total sales. Respondent contends that Dr. Rossi's percentages do not agree exactly with other figures for the year 1992 prepared by petitioners' accountants. Dr. Rossi's percentages, however, find sufficient support in the testimony of petitioners' witnesses. For each of the years in issue, beer accounted for approximately 42 percent of sales, wine and liquor accounted for 22 percent, cigarettes accounted for 33 percent, and miscellaneous items accounted for the remaining 3 percent. We additionally accept Dr. Rossi's assertion that an analysis of data for 1991, the middle of the years at issue, generally is applicable to the other 2 years as well. Neither party has shown a basis for concluding otherwise. Finally, we believe that Dr. Rossi's understanding of Nick's Liquors' methods of doing business, and the competitive environment for that

business, finds convincing support in the record.

While we agree with much of Dr. Rossi's presentation, we do not agree with some of his premises. Nick, Jr. and Liz spent considerable time in relating Nick's Liquors' advertised sales prices for the years in issue to contemporary invoices from its wholesalers. Their results have been placed into evidence. They also furnished those results to Dr. Rossi for purposes of preparing his report. Although Dr. Rossi's report does not incorporate all their conclusions, the report does indicate that Dr. Rossi's premises are almost exclusively based upon the assumption that Nick's Liquors' advertised prices represent the regular, everyday prices in the three stores. As we have found, however, this is not necessarily the case. Nick's Liquors sold much of its merchandise at margins considerably in excess of those reflected in the newspaper advertisements. Such sales raised the overall margins to percentages higher than those reported by petitioners or ascertained by Dr. Rossi. We explain our reasoning below.

A. <u>Margins on Sales of Beer</u>

Dr. Rossi determined the overall beer margin to be an average of 5.99 percent. When Dr. Rossi found one of his six selected beer items on an invoice from petitioners' records, he noted its profit margin as reflected in the advertisements. He found these 6 selected items on 99 invoices, and divided the

total margin percentages by 99.

This procedure does not take into account sufficiently the volume of the specific brands sold. Dr. Rossi's report indicates that petitioners purchased substantially more of some of the six selected items than others. Petitioners' usual margins on these highest-volume items were higher than 5.99 percent. For example, tables attached to Dr. Rossi's report indicate the usual margin for the 2 biggest sellers, Budweiser/Bud Lite and Miller Lite, as advertised was 6.81 percent. Third in volume, and most often advertised, was a beer named "Old Style"; its usual margin as advertised was 6.56 percent. Petitioners advertised other sizes of "Old Style" and other brands at higher margins. We conclude that, when volume of sales is taken into account, the average margin of advertised beer was more likely 7 percent than the 6-percent figure used by Dr. Rossi.

Additionally, Dr. Rossi apparently has assumed that the average 5.99-percent margin for sale-priced beer applied to beer that was not on sale. It does not appear that Dr. Rossi was furnished evidence of the margins on beer that was not advertised. When we take into account the margins on unadvertised beer, such as the 15.8 margin on unadvertised "Old Style", the average margin becomes higher.

Finally, Dr. Rossi's report does not consider the margins on other beer sales, such as the sale of cold beer, beer sold in 6

packs, and imported beers.

In view of the foregoing, we conclude that the margin for all sizes of all beer sold, including imported and cold beer, lies somewhere between Dr. Rossi's figure of 5.99 percent for advertised "sale" beer and the 15.8 percent for unadvertised beer. On the basis of the entire record before us, we find that the margin applicable to overall beer sales during the years in issue is 11 percent.

### B.  Margins on Sales of Wine and Liquor

Dr. Rossi's report also provides the basis for our findings as to the overall margin applicable to petitioners' sales of wine and liquor. Again, however, we disagree with some of his premises.

Dr. Rossi based his determination of wine and liquor sales upon his analysis of petitioners' invoices and advertised prices for the years in issue, but his analysis apparently did not include specific nonsale prices charged by petitioners during the years at issue. Dr. Rossi determined that the margin applicable to sale items in the month of December, when petitioners advertised most heavily, was approximately 7 percent. He further determined that, based upon sales invoices, petitioners sold approximately 32 percent of their wine and liquor products during December. He further assumed that the average margin was 14 percent for the rest of the year, when petitioners sold the

remaining 68 percent of the wine and liquor inventory.

Respondent does not contest the average December margin of 7 percent. Respondent does take issue with Dr. Rossi's conclusion, based upon the checks written during December of 1991 and the first week of January 1992, that 32 percent of annual wine and liquor sales took place in December of 1991. Petitioners' ledger books for their three stores indicate total December sales of $934,920. Their 1991 tax return indicates total annual sales of $9,054,086. Thus, their books and tax returns indicate that approximately 10.32 percent of total sales of all products took place in December. We conclude that, while December was a month of heavier-than-average sales of wine and liquor, such sales did not amount to 32 percent of the total.

Moreover, we question Dr. Rossi's assumption that the overall margin on wine and liquor for the other 11 months of the year averaged 14 percent. That percentage seems somewhat arbitrary. Dr. Rossi apparently was not made aware that petitioners' unadvertised sales of wine and liquor provided much higher profit margins, such as 17 percent on a liter of Jack Daniels whiskey, 26.1 percent on a 750-milliliter bottle of Riunite Wine, and 22.8 percent for the same size bottle of Andre Pink Champagne.

Our review of the record indicates, moreover, that the 7-percent average margin applicable to advertised wine and liquor

in December is generally applicable to advertised wine and liquor during the other months of the year. This low margin takes into account the year-round "loss leaders" that petitioners advertised and sold below cost, as well as the higher margin, but still discounted, sale of wine and liquor. Petitioners charged similarly discounted prices in this range for their in-store and "perma sales".

We further conclude that there were substantial sales of petitioners' nonadvertised, and smaller sized, wine and liquor. This category included items such as the 750-milliliter Riunite wine, the 750-milliliter Andre Pink Champagne, and 1-liter Jack Daniels whiskey. These items, while still generally priced at a discount from retail averages, nevertheless sold at margins near 20 percent.

On the basis of the foregoing, we find that the overall margin applicable to petitioners' annual sales of wine and liquor was 13.5 percent.

### C. Margins on Sales of Cigarettes

Dr. Rossi determined that the cigarette invoices and advertisements supported a finding that the average margin on both generic and brand-name cigarettes was 5 percent.

Once again, Dr. Rossi's figures are based upon advertised sale prices. Petitioners' principal competitor indicated, however, that cigarette margins varied; he himself had made

between $.10 and $1 per carton.

Petitioners did not always maintain sale-price margins for all their cigarettes. Sometimes, some of their cigarettes were not on sale. Our understanding of the highly competitive cigarette prices near the Illinois border indicates, however, that there was little room for the higher margin of 10 to 15 percent routinely charged by stores just 10 miles away from Nick's Liquors. We doubt that Nick's Liquors' prices ever exceeded the 8-percent "fair trade" addition to cost imposed under Indiana law. Nick's Liquors' imposed a higher margin on cigarettes sold by the pack, however. All things considered, we find that Nick's Liquors' cigarettes, for the years in issue, sold for an average margin of 6.5 percent.

Respondent argues that the cigarette margin could, in fact, be much higher because Dr. Rossi's figures fail to take into account the large volume of cigarette coupon proceeds that Nick received from cigarette manufacturers. The evidence shows that Nick's Liquors redeemed several hundred thousand dollars' worth of these coupons per year. Our review of the evidence indicates, however, that, in computing their margins on cigarette sales, petitioners have taken into account such coupons. There is no indication that they varied from this practice when they provided their cost information to Dr. Rossi.

### D. Petitioners' Average Margin

To summarize, for the years in issue, Nick's Liquors sold

beer, which accounted for 42 percent of its sales, at an average margin of 11 percent. Nick's Liquors sold wine and liquor, which accounted for 22 percent of its sales, at an average margin of 13.5 percent. Cigarettes accounted for approximately 33 percent of sales, and they sold at an average margin of 6.5 percent. The other 3 percent of sales was for miscellaneous items. Petitioners have not provided a sufficient basis for us to find that their profit margin on miscellaneous items was less than the approximately 27 percent proposed by respondent.

The overall result is that petitioners' weighted gross margin for the years in issue is 10.54 percent.

IV. Petitioners' Theft Loss Deduction

On October 25, 1991, $22,773 was stolen from store No. 1. Petitioners' logbook entry for that date does not contain an entry for the amount of the day's sales receipts. Instead, the logbook contains the following entry: "Robbed 10-25-91". Of the amount stolen, respondent has allowed the deduction of $3,004, which represents lottery tickets, receipts for the sale of those tickets, and beer deposits. These apparently are amounts that petitioners, in the course of their business, were holding as agents for third parties, including the State of Indiana.

Section 165(h) permits a deduction for a loss arising from theft. It is settled, however, that the amount of a theft loss may not exceed basis. In the case of cash which is part of gross receipts, the amount of loss due to theft is not deductible if

the victimized taxpayer has failed to take the amount stolen into income.  Permitting a theft loss deduction in these circumstances would amount to allowing a double deduction.  United States v. Kleifgen, 557 F.2d 1293, 1299 (9th Cir. 1977); cf. Alsop v. Commissioner, 290 F.2d 726, 727 (2d Cir. 1961), affg. 34 T.C. 606 (1960).

In this case petitioners figured their taxable income by totaling up their sales and then deducting from that total their costs of goods sold and other expenses.  When they excluded the stolen $22,773 from their total sales but did not change their cost of goods sold, they effectively lowered their reported income by $22,773.  Their action produced the same effect as if they had included the $22,773 amount in sales (and thus in income) and then been allowed a deduction of that amount as a theft loss deduction.  Here, having excluded the $22,773 from total sales, they may not deduct the $22,773 as a theft loss.  To do so would be to obtain a second tax benefit for only one loss.[4]

---

[4]    Sec. 1.165-8(c), Income Tax Regs., provides that the taxpayers are to determine the amount of a theft loss deduction under the rules for deductibility of casualty losses.  The pertinent part of the latter regulations, sec. 1.165-7(b), Income Tax Regs., provides that the amount deductible for such a loss is the lesser of the difference between the fair market value of the property before and after the theft, or the adjusted basis of the property.

Petitioners are cash basis taxpayers.  They have shown neither that they actually received and took into income the stolen money, nor that they paid income tax on the amount stolen for 1991, or any other year.  Thus, they did not acquire a basis in the property.  Apparently, however, they were required to
(continued...)

## V. Petitioners' Interest Deduction

On or about February 10, 1992, respondent assessed petitioners additional income tax of $286,147.50 for their 1986 tax year and $272,146 for their 1987 tax year. The assessments for 1986 and 1987 resulted from respondent's increase in petitioners' reported gross business profits for those years, based upon respondent's use of a bank deposits analysis. In 1992, petitioners paid $393,024 in interest on the additional amounts assessed for 1986 and 1987. Petitioners deducted the amount of the interest payment on their 1992 Federal income tax return.

Respondent disallowed this deduction, alleging that it was personal interest under section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987). We disagree.[5]

---

[4](...continued)
repay $3,004 of the amount stolen in lotto money and beer deposits that they were holding for others. This repayment gave them a basis in that amount. See Reis v. Commissioner, T.C. Memo. 1996-469.

[5] Sec. 1.163-9T(b)(2)(i)(A), Temporary Income Tax. Regs., 52 Fed. Reg. 48409 (Dec. 22, 1987), provides in part:

(2) Interest relating to taxes--(i) In general. Except as provided in paragraph (b)(2)(iii) of this section, personal interest includes interest--

(A) Paid on underpayments of individual Federal, State or local income taxes * * * regardless of the source of the income generating the tax liability * * *.

Section 163(h)(2)(A) exempts from the category of personal interest (which is nondeductible for individuals) "interest paid or accrued on indebtedness properly allocable to a trade or business (other than the trade or business of performing as an employee)".

In Redlark v. Commissioner, 106 T.C. 31 (1996), on appeal (9th Cir., May 15, 1996), the taxpayers deducted the amount of interest on the portion of a deficiency in Federal income tax arising out of the Commissioner's adjustments that resulted from accounting errors in the taxpayers' unincorporated business. The Commissioner, relying on the provisions of section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, denied the deduction, arguing that the payment at issue was the payment of personal interest. We disagreed, holding that section 1.163-9T(b)(2)(i)(A), Temporary Income Tax Regs., supra, was invalid insofar as it applied to the taxpayers' circumstances. We further held that the interest at issue was deductible as interest on an "indebtedness properly allocable to a trade or business" within the meaning of section 163(h)(2)(A).

The principle of Redlark applies here. There is no dispute that petitioners, cash basis taxpayers, paid the interest at issue on income tax deficiencies resulting from their operation of Nick's Liquors, their unincorporated trade or business. Under section 163(h)(2)(A), the interest they paid is deductible because it was paid upon an indebtedness properly allocable to

their trade or business.

VI. <u>Accuracy-related Penalties</u>

Respondent determined that petitioners are liable for accuracy-related penalties under section 6662(a).  Section 6662(a) imposes a penalty equal to 20 percent of the underpayment of tax attributable to one or more of the items set forth in section 6662(b).  Respondent asserts that the entire underpayments in issue were due to petitioners' negligence or disregard of rules or regulations.  Sec. 6662(b)(1).

Negligence has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985) (citing <u>Marcello v. Commissioner</u>, 380 F.2d 499, 506 (5th Cir. 1967)).  Respondent's determinations are presumed correct, and petitioners bear the burden of proving otherwise.  Rule 142(a); <u>Luman v. Commissioner</u>, 79 T.C. 846, 860-861 (1982).

Failure to keep adequate records is evidence of negligence. <u>Marcello v. Commissioner</u>, <u>supra</u> at 507;  <u>Magnon v. Commissioner</u>, 73 T.C. 980, 1008 (1980).  Petitioners here did not maintain adequate records regarding the amount of their sales. Petitioners argue that their ledgers adequately reflected their records.  They point out that the accountants who prepared their returns found the records adequate, as did one of their expert witnesses, who is an accountant, a former Internal Revenue Service supervisor, and a veteran of many IRS audits.

Petitioners also have produced bank reconciliations prepared by a certified public accountant that indicate that the amounts reported on petitioners' books for the years in issue support their receipts and costs and expenses, as reflected on their Federal income tax returns.

Petitioners' argument fails to take into account the possibility that their books and bank deposits may appear to be accurate, but still may not reflect all the cash receipts. Respondent is entitled to insist that petitioners maintain records in addition to books that only may be "apparently accurate". Schwarzkopf v. Commissioner, 246 F.2d at 734. Nick's practices of taking cash from the stores' proceeds to meet his payrolls, to pay business expenses, and to provide for his personal needs all provided ample opportunity for a failure to record all the receipts taken in. Early during the years in issue, Nick was properly advised to retain his cash register receipts and "Z-tapes" before the years in issue. Retention of these materials would have provided an objective measure of petitioners' receipts. Doing so also would likely have provided for the reporting of the proper amounts of income tax. Nick, however, failed to follow that advice.

We conclude that the underpayments for the taxable years 1990, 1991, and 1992, to the extent that they relate to understated profit margins, are attributable to negligence. With regard to other underpayments, however, the record does not

support the imposition of accuracy-related penalties.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>