T.C. Memo. 2004-82

UNITED STATES TAX COURT

NICK KIKALOS AND HELEN KIKALOS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11486-01.                    Filed March 23, 2004.

<u>John J. Morrison</u>, for petitioners.

<u>Ronald T. Jordan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a deficiency in
petitioners' Federal income tax for the taxable year 1997 of
$105,296 and a penalty under section 6662(a)[1] in the amount of

---

[1] All section references are to the Internal Revenue Code in
effect for the year at issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure, unless otherwise
indicated.

$21,059.20. After concessions,[2] the issues presented for our consideration are: (1) Whether petitioners' income was understated and (2) whether petitioners are subject to section 6662(a) penalties for substantial understatement of tax or negligent disregard of the rules or regulations.

## FINDINGS OF FACT[3]

Petitioners Nick Kikalos and Helen Kikalos resided in Hammond, Indiana, at the time their petition was filed. In the statutory notice of deficiency, respondent determined that petitioners had unreported income from the following sources: (1) Coupon and buy-down reimbursement payments from tobacco companies; (2) rack and promotional payments; (3) vendor refunds and reimbursements; and (4) insurance recovery payments.

During 1997, Nick Kikalos[4] (petitioner) owned and operated four retail stores under the name of Nick's Liquor Mart (Nick's Liquors) in Hammond, Indiana, selling cigarettes, beer, liquor, wine, and other products. During the year at issue, cigarette manufacturers employed "buy-down" programs to lower the cost of cigarettes at which retailers, including Nick's Liquors, sold to

---

[2] Respondent conceded $23,244 of the $224,620 gross receipts adjustment, as well as an adjustment of $19,652 with respect to unreported income from H&L Display Co.

[3] The parties' stipulation of facts is incorporated by this reference.

[4] Petitioner Helen Kikalos is a party to this case by reason of the fact that she filed a joint Federal income tax return with Nick Kikalos for the year under consideration.

consumers. A buy-down is a discount given to a retailer for each carton of cigarettes sold during a given promotional period.

Cigarette manufacturers expected the retailers to pass along the buy-down discounts to the customers. The manufacturers used different approaches to verify this expectation. Some of the manufacturers' sales representatives, during periodic sales calls, confirmed that retailers complied. Other cigarette manufacturers required the retailers to take inventories to reconcile with the amount of buy-down payments. In such cases, the buy-down amounts were computed by taking the change in inventory for a given buy-down period and adding the total cigarette purchases during the same period. When required, Nick's Liquors performed this accounting and furnished it to cigarette manufacturers before they paid the buy-downs. Such accountings were not audited or verified by the cigarette manufacturers. Lastly, a number of cigarette manufacturers paid buy-down discounts to retailers based on the number of cartons purchased during a given buy-down period.

Because of delays in processing the buy-down information, Nick's Liquors received buy-down payments weeks or months after the transactions with the ultimate consumer. Thus, some buy-down checks received by Nick's Liquors in 1997 contained payments with

respect to 1996 sales activity, and some buy-down checks received in 1998 contained payments with respect to 1997 sales activity.

Nick's Liquors also accepted or honored paper coupons presented by customers. Petitioner submitted the coupons to each cigarette manufacturer for reimbursement of the face value of the coupon, plus postage costs.

Petitioner reported $653,164 in coupon and buy-down income on his 1997 Federal income tax return. During the audit examination, petitioner provided respondent with four worksheets[5] detailing coupon and buy-down and rack and promotional income. Each worksheet included summary totals for all four stores. One worksheet reflected coupon and buy-down income totaling $777,848, while the remaining worksheets reflected a total of $521,695.

To protect the Government's interest, the revenue agent based her examination on the worksheet that reflected $777,848 of coupon and buy-down income. Despite requests by the revenue agent, petitioner did not furnish respondent with adequate records to substantiate the amount of coupon and buy-down income recorded by each store on a daily, monthly, or annual basis.

---

[5] The record is unclear as to why petitioner provided four separate summary worksheets to the revenue agent. Petitioner did not adequately explain why they were substantially similar with one inconsistency as to the total.

Further, he did not provide adequate records to reconcile coupon and buy-down reimbursement payments with amounts reported as coupon and buy-down income.

The revenue agent used records she requested and received directly from cigarette manufacturers in an attempt to reconcile the $777,848 coupon and buy-down income total with associated payments received from cigarette manufacturers. Some cigarette manufacturers provided summary schedules of buy-down payments made to petitioner. Others provided copies of buy-down checks sent to petitioner. Many of the records the revenue agent received were incomplete and/or inaccurate, and the revenue agent was unable to reconcile petitioner's return to the available records. As a result, respondent determined that petitioner's coupon and buy-down income was $777,848 and therefore understated by $124,684.

Petitioner reported $16,736 in promotional income on his 1997 Federal income tax return consisting of $11,284 in "rack and promotional income", and $5,452 of "8 cent coupon" income reimbursement payments from cigarette manufacturers for the cost of mailing paper coupons. The summary worksheets provided by petitioner reflected total rack and promotional income of $63,940. Additional documents revealed that petitioner received $5,452 in "8 cent coupon" income and $523 in postage income.

Petitioner entered into a promotional contract with R.J. Reynolds Tobacco Co. (R.J. Reynolds) having an effective date of January 1, 1996, and no specific term or ending date. Pursuant to the contract, petitioner was to receive quarterly promotional payments of $13,164 upon meeting certain sales volume requirements set by R.J. Reynolds. During 1997, petitioner negotiated a $13,164 check issued by R.J. Reynolds to purchase a cashier's check. The check was dated October 27, 1997, and was for the same amount as called for in the promotional contract.

Based on petitioner's records, respondent determined that petitioner's rack and promotional income totaled $69,915 ($63,940 + $5,452 + $523). Respondent also determined that petitioner underreported rack and promotional income by $53,179 ($69,915 less $16,736 reported).

During the examination, Mercantile National Bank (Mercantile), informed respondent that during 1997, petitioner acquired 31 cashier's checks totaling $809,734. Petitioner exchanged cash and negotiated third party checks he received from business-related and personal sources for the cashier's checks. Petitioner, by using third party checks and cash less than $10,000 in amount to purchase the cashier's checks, tried to avoid the reporting of cash transactions exceeding $10,000 to the Internal Revenue Service. Petitioner did not inform his

accountant of the existence of the cashier's checks or record the receipt of the third party checks in the accounting records for Nick's Liquors.

During 1997, Nick's Liquors engaged in "bulk sales", which were large, nonitemized orders taken over the phone. The employee taking a bulk sales order recorded it on paper and made a copy that was sent to the office of Nick's Liquors. The employee personally delivered the order to the customer. Payment received for the order would either be mailed or delivered to petitioner in the form of a check. Some of the checks that petitioner received for bulk sales were used to purchase cashier's checks. Respondent determined that petitioner's gross receipts were underreported by $25,425 with respect to these checks. Petitioner did report $6,569 of the bulk sales checks as income.

During 1997, petitioner used checks received for reimbursements and refunds from commercial vendors totaling $3,007 to buy cashier's checks. Respondent determined that petitioner's gross receipts did not include these checks. Petitioner did not provide adequate records to substantiate that these payments were properly included in income.

Petitioner also used two payments from insurance companies to Nick's Liquors to buy cashier's checks. One of the checks was dated December 10, 1996, in the amount of $894. The other check,

in the amount of $165, was dated January 13, 1997. Respondent determined that petitioner failed to include those checks totaling $1,059 in gross receipts. Petitioner did not provide respondent records to substantiate that these payments were properly included in income.

Before their 1997 tax year, petitioners were notified on several occasions that their records were inadequate. In the case of Kikalos v. Commissioner, T.C. Memo. 1998-92, revd. in part 190 F.3d 791 (7th Cir. 1999), this Court found that petitioner's records with respect to Nick's Liquors were inadequate for 1990, 1991, and 1992. In that opinion it was noted that petitioner had been advised to retain adequate records before his 1990 and 1991 tax years. Further, on June 9, 1995, petitioner entered into a records retention agreement with the Internal Revenue Service agreeing that he would maintain certain records. Petitioner did not adequately comply with his June 9, 1995, agreement.

                              OPINION

We consider here whether petitioner has shown that respondent's determination is in error. Respondent determined that petitioner failed to report business income from several sources. In spite of numerous warnings, petitioner did not maintain adequate records for 1997. Petitioner knowingly

permitted this situation, and also purchased cashier's checks in such a manner so as to conceal certain activity from the Government.

Pursuant to section 61(a), gross income includes income from whatever source derived. Sec. 61(a); Cabirac v. Commissioner, 120 T.C. 163, 167 (2003). In addition, taxpayers are required to keep permanent records that are sufficient to establish the amount of gross income, deductions, credits, or other amounts on their tax returns. See sec. 6001; sec. 1.6001-1, Income Tax Regs. In this case, petitioner bears the burden of showing that respondent's determination is in error.[6] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Because the disputed items of income adjustments concern several different sources, we examine each source separately.

I. Coupon and Buy-Down Income

Respondent determined that petitioner failed to report $124,684 of coupon and buy-down income. At trial and on brief, respondent bolstered his determination by offering an alternate computation to measure petitioner's total coupon and buy-down income.

---

[6] With respect to the determination of underreported income, no question has been raised with respect to the burden of proof under sec. 7491(a). Even if petitioner had raised the issue, his failure to keep adequate records and substantiate items has not met the conditions for placing the burden on respondent. See sec. 7491(a)(2).

As a first step, respondent reviewed copies of third party checks that petitioner used to purchase cashier's checks. During 1997 petitioner purchased in excess of $800,000 in cashier's checks with cash, and negotiated third party business and personal checks. Petitioner testified that he purchased the cashier's checks to protect his money in case of a bank failure. He also testified that one of his objectives in using third party checks to purchase cashier's checks was to prevent the bank from reporting cash transactions exceeding $10,000 to the Internal Revenue Service. Significantly, petitioner failed to provide any documentation to show that the third party checks used to purchase cashier's checks were included in business gross receipts. Finally, petitioner's accountant testified that she had no knowledge of the existence of the cashier's checks.

Because petitioner presented no evidence to account for the third party checks, respondent designated checks from cigarette manufacturers, and not related to other types of income, as coupon and buy-down receipt checks. Checks totaling $531,605 fit into that category.

In addition, petitioner's accountant made a $400,746 accounting entry in petitioner's October 1997 records with respect to checks received from cigarette manufacturers. Respondent accepted that entry as reflecting payments received from cigarette manufacturers. Because no activity was recorded

in the account until the October 1997 entry was made, respondent concluded that the $400,746 was an accumulation of coupon and buy-down payments received by Nick's Liquors for the period of January through October 1997.

Third, petitioner admitted that $73,392 of coupon and buy-down income from 1996 activity had been reported in 1997. Further, respondent calculated that $100,810 of coupon and buy-down income for 1997 activity was reported in 1998. Due to usual time delays in processing reimbursement payments, respondent based this figure on petitioner's reported November and December 1997 coupon and buy-down income.

Lastly, respondent made a downward adjustment of $63,940 to prevent duplication with respect to rack and promotional income. Respondent's calculation, which is on the basis of evidence in the record of this case, resulted in $895,829 of coupon and buy-down income for 1997. Respondent's calculation is summarized as follows:

Payments received in 1997:

| | |
|---|---|
| Coupon and buy-down checks used to acquire cashier's checks | $531,606 |
| Other amounts deposited and recorded in financial records | 400,746 |
| | 932,352 |
| Adjustments: | |
| 1996 income reported in 1997 | (73,392) |
| 1997 income reported in 1998 | 100,810 |
| Rack and promotional income (duplicate adjustment) | (63,940) |
| 1997 coupon and buy-down income | 895,830 |

Subtracting the $653,164 reported by petitioner, respondent arrived at unreported coupon and buy-down income of $242,666 ($895,830 - $653,164). Despite the fact that respondent's calculation reflected almost twice as much unreported income as the $124,684 amount determined originally, respondent does not seek an increased deficiency. Petitioner argues that respondent's alternate calculation of coupon and buy-down income is a new theory raised for the first time on brief, that it violates principles of fair play and justice, and it should not be considered by the Court. Respondent asserts that the trial was a de novo proceeding, and the administrative record is irrelevant.

Respondent's calculation is not a new theory. It is merely a mathematical analysis of evidence before the Court and offered in support of respondent's determination. Petitioner's dilemma here is one of his own making. On the basis of the state of petitioner's records, neither he nor respondent may properly substantiate his income and/or establish that the determination was in error. Petitioner was well aware of his obligation to maintain adequate records and knowingly failed to do so.

Petitioner devotes much of his brief to criticizing the means by which respondent arrived at his determination and/or supplementary calculation. This criticism focuses on the lack of adequate documentation used by respondent in the determination

and calculation. While petitioner's criticisms are to some extent valid, petitioner has not provided records or a more reliable means to account for his business income. Moreover, the lack of records is due to petitioner's design.

Petitioner also makes the theoretical argument that coupon and buy-down income was accounted for at the point of sale. Respondent counters that petitioner did not provide adequate records to show that employees consistently followed the point of sale procedure for recording coupon and buy-down income. Therefore, petitioner has not met his burden of establishing that respondent's determination was in error.

Unlike other consumer transactions, petitioner could not use a cash method of accounting for coupon and buy-down income because of the delay in receiving reimbursement payments. Therefore, petitioner appears to have used a hybrid accounting method. Revenues from consumer purchases and other sources were recorded on a cash basis, and coupon and buy-down income was reported on an accrual basis. Petitioner testified that employees accounted for coupon and buy-down income by ringing up on the cash register the full price of the carton or pack of cigarettes sold, while collecting from the customer the discounted price. The transaction also would include ringing up the amount of the buy-down or coupon. As a result, petitioner maintained that the full amount of revenue for each cigarette

sale was recorded at the time of purchase.  Therefore, any subsequent reimbursement received by petitioner for the discounts had no effect on income.

Petitioner, however, failed to provide adequate documentation to show that these procedures were consistently followed.  Petitioner did supply records to corroborate petitioner's assertions for 2 days' worth of sales activity for a single store.  However, during the year at issue Nick's Liquors operated four locations with aggregate gross receipts from cigarette sales totaling several million dollars.  Given the volume of cigarette transactions generated by the four Nick's Liquors stores, the records provided by petitioner are not sufficient evidence to establish that coupons and buy-downs were consistently and completely recorded in all four stores.[7] Petitioner's testimony that the coupon and buy-down point of sale procedure was consistently followed, by itself, is not sufficient to carry his burden.  Accordingly, we hold that petitioner failed to report coupon and buy-down income of $124,684 for 1997, as determined by respondent.

II.  Promotional Income

Petitioner reported $16,736 of promotional income for 1997. Respondent determined that petitioner received $69,915 of

---

[7] It is somewhat curious that petitioner was able to provide only 2 days of tapes for a single store.  That is certainly too small a sample to provide insight into the universe we consider.

promotional income and that his gross income was understated by $53,179. The $69,915 amount is composed of three components. The first and second components are $5,452 of "8 cent coupon" income and $523 of postage income. Petitioner reported the $5,452 of "8 cent coupon" income as a portion of the total $16,736 of promotional income reported on his 1997 return. Petitioner conceded that he failed to report $523 in postage income.

The remaining $63,940 (third component) was derived from the worksheets provided by petitioner. The rack and promotional income shown on all four worksheets totaled $63,940. Respondent points out that petitioner's promotional contract with R.J. Reynolds was in effect during 1997, a fact that supports respondent's determination. Petitioner argues that the worksheets are unreliable due to the fact that he was in the process of learning how to use a computer and made input errors. In addition, petitioner asserts that the R.J. Reynolds promotional contract was not in effect during 1997 and that he did not receive any payments under the contract.

During 1997 petitioner received a check from R.J. Reynolds for $13,164, the quarterly amount called for in the promotional contract. Although the record does not reflect the specific purpose for the payment, it coincides with the amount called for in the promotional contract. Quarterly payments of $13,164 would

result in annual promotional income of $52,656 from the R.J. Reynolds contract ($13,164 x 4).  Adding this annualized figure to petitioner's reported promotional income of $16,736 and conceded postage income of $523 results in a total of $69,915, the amount of respondent's determination.

Petitioner contends:  (1) He made input errors; (2) respondent did not produce a 1997 Form 1099 from R.J. Reynolds to petitioner; and (3) respondent failed to receive evidence from R.J. Reynolds to prove that the payments were made under the promotional contract.  Respondent, however, does not bear the burden of showing that the determination is correct.  Petitioner has the burden of establishing that the determination is erroneous.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. at 115. This is another instance where petitioner's failure to maintain records is the root of the problem.  We cannot allow petitioner to hide behind his own contrivance in this setting.  Accordingly, we hold that petitioner failed to report promotional income of $53,179.

## III.  Bulk Sales Income

Respondent determined that $25,425 in third party checks used by petitioner to purchase cashier's checks were from Nick's Liquors bulk sales customers.  Because the checks had not been accounted for in petitioner's records, respondent determined $25,425 in bulk sales was not included in income for 1997.

Petitioner did verify that $6,569 in bulk sales was included in income. Respondent conceded the $6,569 so that $18,856 remains in dispute.

Petitioner argues his combination of substantiation of $6,569 in bulk sales and the testimony offered about the procedures employed for recording bulk sales is sufficient to show that all bulk sales were properly recorded. Petitioner also argues that the burden of reviewing a large amount of register tapes was too great to substantiate all bulk sales transactions.

Despite having access to records that could substantiate all bulk sales, petitioner failed to offer this evidence. Petitioner had register tapes available, and self-serving testimony does not suffice to satisfy petitioner's burden. We are not required to accept such testimony. Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992). Accordingly, we hold that petitioner failed to report $18,856 of bulk sales income, the amount of respondent's determination net of concessions.

IV. Vendor Refunds and Reimbursements Income

Respondent also determined that $3,007 in third party checks used to purchase cashier's checks was attributable to vendor refunds and reimbursements not included in petitioner's 1997 gross income. Petitioner argues that the payments were included in income, but he has not provided any records to substantiate these assertions. Taxpayers are required to keep permanent

records that are sufficient to establish the amount of gross income, deductions, credits, or other amounts on their tax returns. See sec. 6001; sec. 1.6001-1, Income Tax Regs. Petitioner failed to keep records so as to show respondent's determination is erroneous. Accordingly, we hold that petitioner failed to report vendor refunds and reimbursement income of $3,007 for 1997.

## V. Insurance Recoveries

Finally, respondent determined that two of the third party checks totaling $1,059 were attributable to insurance recoveries not reported as income for 1997. The checks were from insurance companies, in the amounts of $894 and $165, and dated December 10, 1996, and January 13, 1997, respectively.

With respect to the $894 check, petitioner argues that the check cannot be attributable to his 1997 income because it must have been received in 1996. Respondent argues that this check was one of several checks petitioner used to purchase a cashier's check on January 14, 1997. Because petitioner purchased a cashier's check on January 7, 1997, and did not use the $894 check, respondent maintains that petitioner must not have received the check until after January 7, 1997. Therefore, the check must be attributable to petitioner's 1997 tax year.

Section 451(a) provides the general rule that "any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." Petitioner, who reports this type of income on the cash method, must report income in the year it is actually or constructively received. See sec. 1.451-1(a), Income Tax Regs. We agree with petitioner that a check mailed on December 10, 1996, would likely have been received by petitioner during 1996 and thus be includable in 1996 income.

With respect to the $165 check, respondent contends that the insurance recovery relates to a claim made by Cigarette City, a company owned by petitioner's children. Petitioner contends that he reimbursed Cigarette City for the amount of the check. Petitioner, however, has not provided any credible evidence other than his own self-serving testimony that the reimbursement occurred. Accordingly, we hold that petitioner underreported his insurance reimbursement income by $165.

## VI. Accuracy-Related Penalties Under Section 6662 for Negligence or Disregard of the Rules or Regulations

Section 6662 provides for a 20-percent penalty on any understatement of tax attributable to negligence or disregard of the rules or regulations, or any substantial understatement of income tax. Pursuant to section 6662(c), negligence includes any

failure to make a reasonable attempt to comply with the Internal Revenue Code including a careless, reckless, or intentional disregard of the Code.

Section 7491(c) applies to examinations which commence after July 22, 1998. Pursuant to this section, respondent has the burden of production with respect to the liability of any individual for any penalty or addition to tax. See sec. 7491(c). "[F]or the Commissioner to meet his burden of production, the Commissioner must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." Higbee v. Commissioner, 116 T.C. 438, 446 (2001). In Higbee, we found that respondent met his burden of production for the negligence penalty by showing that petitioners failed to keep adequate books and records or to substantiate properly the items in question. Id. at 449. Consequently, we conclude that respondent has met his burden of production for his determination of the accuracy-related penalty based on negligence or disregard of rules or regulations.

Pursuant to section 6662(c), negligence includes any failure by a taxpayer to keep adequate books or records. See sec. 1.6662-3(b), Income Tax Regs. For the purposes of this section, a taxpayer is negligent when he or she fails "to do what a reasonable and ordinarily prudent person would do under the circumstances." Korshin v. Commissioner, 91 F.3d 670, 672 (4th

Cir. 1996)(quoting <u>Schrum v. Commissioner</u>, 33 F.3d 426, 437 (4th Cir. 1994), affg. T.C. Memo. 1995-46).

The record reflects that petitioner failed to maintain adequate records after repeatedly being advised to do so by respondent. In the case of <u>Kikalos v. Commissioner</u>, T.C. Memo. 1998-92, we found that petitioner's records were inadequate for 1990, 1991, and 1992. In that case, we noted that before the years at issue, petitioner was advised that his records were inadequate. After repeated warnings by respondent, on June 9, 1995, petitioners agreed to and signed a records retention agreement with the Internal Revenue Service. The agreement specifically identified records that petitioner was to maintain going forward. Despite the warnings and the agreement, petitioner still made the choice not to maintain adequate records. Further, we find significant petitioner's testimony that his practice of purchasing cashier's checks was partly designed to conceal large cash transactions from the Government.

Petitioners' actions are not what a reasonable and ordinarily prudent person would do under the circumstances and constitute negligence. Accordingly, we hold that petitioner is subject to the accuracy-related penalty under section 6662(a).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.
