T.C. Memo. 2010-175


UNITED STATES TAX COURT


RANDAL W. HOLDNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

WILLIAM F. HOLDNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10367-08, 10375-08.    Filed August 4, 2010.


Randal W. Holdner and William F. Holdner, pro sese.

<u>Kelley A. Blaine</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Petitioners, father and son, have run a farming operation (Holdner Farms) since 1977.  Each petitioner effectively reported one-half of Holdner Farms' gross income for 2004, 2005, and 2006 on Schedules F, Profit or Loss From Farming,

and Schedules D, Capital Gains and Losses, of their respective Federal income tax returns for those years, but they did not split the expenses equally or file Federal partnership returns. Petitioner William F. Holdner (William Holdner) deducted most of Holdner Farms' expenses on Schedules F attached to his 2004-2006 returns.

In separate notices of deficiency issued to petitioners, respondent determined that (1) Holdner Farms was a partnership (or a joint venture taxed as a partnership) for Federal income tax purposes in 2004-2006, (2) petitioners were equal partners in the partnership, and (3) William Holdner was liable for the section 6662[1] accuracy-related penalty for 2004-2006. To protect against a whipsaw situation, respondent allocated 100 percent of Holdner Farms' income to each petitioner, disallowed all expenses,[2] and determined the following deficiencies and penalties:

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent's counsel explained at trial that respondent took these positions to avoid a potential whipsaw situation and to bring the entire case before the Court. Respondent's counsel acknowledged that each petitioner should be allocated only one-half of Holdner Farms' gross income and that each petitioner should be allowed to deduct one-half of Holdner Farms' expenses. Respondent does not intend to pursue deficiencies and penalties in the amounts shown on the notices of deficiency.

|       | Deficiency | | Sec. 6662 Penalty | |
|       | Randal W. | William F. | Randal W. | William F. |
| Year  | Holdner | Holdner | Holdner | Holdner |
| 2004  | [1]$192,731 | $264,016 | -- | $52,803 |
| 2005  | 136,443 | 215,211 | -- | 43,042 |
| 2006  | 197,999 | 296,554 | -- | 59,311 |

[1]All monetary amounts have been rounded to the nearest dollar.

Petitioners timely petitioned this Court to review respondent's determinations.  Respondent moved to consolidate petitioners' cases for trial, briefing, and opinion, and we granted respondent's motion.  The issues for decision are:  (1) Whether petitioners' Holdner Farms activity was a partnership (or a joint venture taxed as a partnership) for Federal income tax purposes during 2004-2006; (2) if so, whether partnership expenses must be allocated in accordance with partnership income; i.e., 50 percent to each petitioner; and (3) whether William Holdner is liable for the section 6662 accuracy-related penalty for 2004-2006.

FINDINGS OF FACT

Some of the facts have been stipulated.  We incorporate the stipulated facts into our findings by this reference.  Petitioners resided in Oregon when their petitions were filed.  William Holdner, a certified public accountant, is the father of petitioner Randal W. Holdner (Randal Holdner).

I.   Background:  1968-77

In 1968 or 1969 William Holdner purchased two cows, a bull, and a horse (collectively, livestock).  His daughter and his son, Randal Holdner, bred the cattle and showed the livestock at 4-H and Future Farmers of America events, and the children's livestock activity expanded each year.

The family kept the livestock at the Home Place, a 3.36-acre property in Scappoose, Oregon, that was improved by petitioners' home,[3] a barn, and an equipment shed and included a pasture.  The Home Place was titled in William Holdner's name.  The record does not disclose when William Holdner purchased the Home Place or how much he paid for the property.

In 1972 William Holdner purchased the Chapman property, a 17-acre parcel in Scappoose, Oregon, consisting of a testing station and a pasture, for $17,000.  William Holdner later purchased a mobile home for the Chapman property for around $10,000.  In 1974 William Holdner purchased the Dutch Canyon property, a 100-acre parcel in Scappoose, Oregon, consisting of a barn, a cattle processing facility, a pollution control system, and a pasture, for $100,000.  The Chapman property and the Dutch Canyon property were titled in William Holdner's name.  For

---

[3]William Holdner still owns the Home Place property, but petitioners no longer live there.

convenience, we shall refer to the Home Place, the Chapman property, and the Dutch Canyon property collectively as the separately owned properties.

II.  Holdner Farms' Formation: 1977

In 1977 Randal Holdner graduated from high school.  He showed little interest in college, so his father offered him a deal--in lieu of paying for a college education, William Holdner would invest in a farming business for him.  Specifically, William Holdner proposed that Randal Holdner manage the day-to-day farming activity on the separately owned properties in exchange for a share of the profits from cattle sales.  Randal Holdner accepted his father's offer.  Petitioners did not commit their agreement to writing.

Under their informal oral agreement, each petitioner had certain duties and responsibilities with respect to the farming operation known as Holdner Farms.  Randal Holdner was responsible for managing the farm, and his duties included feeding the cattle, maintaining farm equipment, and tending to sick animals.  William Holdner was primarily responsible for Holdner Farms' financial affairs, and his duties included arranging cattle sales, making payments to suppliers, and obtaining financing to purchase new farm properties.  William Holdner also agreed, at least initially, to contribute money to the farm, though it is

unclear how much money he actually contributed or whether he expected to be repaid.[4]

Petitioners also agreed to certain financial terms. They agreed that Randal Holdner would be entitled to one-half of Holdner Farms' gross proceeds from cattle sales and that Randal Holdner would have an equity interest in Holdner Farms, though the precise nature of that interest is unclear. The record does not contain any credible evidence that petitioners discussed the allocation of other items of income and expense when the Holdner Farms activity began, nor is there any credible evidence that petitioners reached any agreement regarding the allocation of such items in the early years of Holdner Farms.

When the Holdner Farms activity began, William Holdner did not transfer an interest in the separately owned properties to his son, and petitioners took no steps to clarify their respective interest in the farm equipment or the livestock. However, petitioners had an understanding that all property used in the Holdner Farms enterprise, including the separately owned properties, would be devised to Randal Holdner upon William

---

[4]William Holdner testified at trial regarding his estimate of the respective contributions to Holdner Farms made by him and Randal Holdner, but he did not introduce any documentation to support his estimates. On the record before us we cannot quantify petitioners' respective contributions to Holdner Farms since 1977, and we decline to do so solely on the basis of William Holdner's undocumented and self-serving estimates, which we do not find credible.

Holdner's death,[5] in part to assure that Holdner Farms would remain a viable business upon William Holdner's death.[6]

III. <u>Holdner Farms' Expansion: 1977-2004</u>

William Holdner believed the key to developing a successful farming operation was to acquire income-producing property under

---

[5]William Holdner explained at trial that he wanted Holdner Farms to remain intact upon his death in order to increase the likelihood that the farm would remain a profitable business for his son.

[6]Randal Holdner certainly believed he had an equity interest in Holdner Farms. When Randal Holdner's mother claimed that Holdner Farms was marital property in connection with her divorce from William Holdner, Randal Holdner filed a lawsuit against his parents seeking a judicial declaration recognizing and enforcing his interest in Holdner Farms, including the separately owned properties. See <u>Holdner v. Holdner</u>, 29 P.3d 1199 (Or. Ct. App. 2001). During the trial Mrs. Holdner testified that she was not a party to any alleged agreement between petitioners, and the trial court found her testimony credible. <u>Id.</u> at 1202-1204. The trial court also found that Mrs. Holdner received no consideration for the alleged contract between petitioners. <u>Id.</u> at 1203. On appeal, the Court of Appeals of Oregon affirmed the trial court's judgment, concluding that Randal Holdner had failed to establish the alleged contract by a preponderance of the evidence. Subsequently, petitioners and Mrs. Holdner entered into a settlement agreement under which Mrs. Holdner released her claims to any part of Holdner Farms and any other marital property in exchange for $400,000, which was paid by Holdner Farms out of its income from timber sales, and other consideration.

Neither petitioners nor respondent contend that the judgment in <u>Holdner v. Holdner</u>, <u>supra</u>, is binding on this Court, and we are satisfied that the doctrine of collateral estoppel, or issue preclusion, is not applicable. See <u>Ron Lykins, Inc. v. Commissioner</u>, 133 T.C. 87, 100-101 (2009). This case involves later years and different issues, and the facts relating to the operation of Holdner Farms have changed.

land sales contracts.[7]  That way the properties were available to generate income that could be used to repay the loans.  Between 1984 and 1992 petitioners jointly purchased several properties under land sales contracts.[8]

In 1984 petitioners purchased the Sattler property, a 178.96-acre property in Scappoose, Oregon, consisting of timberland and pasture for $175,000.[9]  Petitioners completed payments under the contract sometime before 2000, and on October 9, 2006, they received a warranty deed from the seller's estate.  Petitioners also jointly leased 90 acres of pasture adjacent to the Sattler property during the years at issue.

---

[7]A land sales contract is a contract that uses seller financing to enable a purchaser to acquire property over time by permitting the purchaser to pay the seller in installments.  The purchaser takes possession of the property immediately but does not acquire title to the property until the loan is completely repaid.  See Black's Law Dictionary 371 (9th ed. 2009).

[8]Several of the jointly purchased properties are close or adjacent to one another, and there is some ambiguity in the record regarding the exact size and location of some of the properties.  For example, the stipulation of facts refers to the Ernest property and the Johnson Landing Road property as separate properties, but Randal Holdner referred to the properties at trial as a single property.  Moreover, the stipulation of facts states that the Ernest property and the Johnson Landing Road property consisted of 54.24 and 115.32 acres, respectively, but Randal Johnson testified that the combined property was 204 acres.  The details regarding the property or properties do not affect our resolution of the issues in this case.  For simplicity, we shall treat the Ernest and Johnson Landing Road properties as a single property.

[9]The purchase price was allocated $125,000 to the land and $50,000 to the timber.

In 1988 or 1989 petitioners purchased the Ernest property, a 54.24-acre farm in Scappoose, Oregon, for $265,000. The Ernest property consists of croplands and pasture and includes land that petitioners lease to a nursery.[10] The property is improved by two houses,[11] two barns, and a cattle processing facility. Petitioners built the two barns using Holdner Farms' profits. Around the same time petitioners purchased the Johnson Landing Road property, a 115.32-acre property that is zoned for farm use. As mentioned above, see supra note 8, petitioners refer to the Ernest and Johnson Landing Road properties as a single property.

In 1989 petitioners purchased the Dike Road property, a 33.22-acre farm property in Scappoose, Oregon. In 1992 petitioners purchased an adjacent 7-acre parcel known as the Hayes property, which includes a house and a pasture. Finally, between 1997 and 2006, petitioners jointly leased 543 acres of pastureland in Vancouver, Washington, across the Columbia River from Oregon.

With the exception of the jointly leased properties, petitioners purchased all of the above-described properties jointly under land sales contracts, with title passing only after the purchase prices were fully paid. Petitioners generated funds

[10]During 2004-2006 petitioners received $5,000 per month in rent from the nursery.

[11]Randal Holdner has lived in one of the houses since the mid-1990s.

to make payments under the land sales contracts by renting out the properties or parts thereof.  All of the aforementioned land sales contracts were paid in full before 2004.  For convenience we shall refer to the properties petitioners purchased or leased jointly as the jointly owned properties.

Petitioners hold title to the jointly owned properties equally as tenants in common.  Although a tenancy in common typically does not include the right of survivorship,[12] petitioners had an understanding that Randal Holdner would inherit the farm, including the jointly owned properties, upon his father's death.[13]

IV.  Holdner Farms' Operations:  2004-2006

By 2004 Holdner Farms had grown into a profitable cattle farming operation.  Petitioners owned as many as 2,000 head of cattle at any given time, and they used all of the separately owned properties and all of the jointly owned properties in the cattle farming business.  Petitioners' total gross revenue from cattle sales in 2004-2006 was nearly $1 million.  In addition,

---

[12]A tenancy in common is "A tenancy by two or more persons, in equal or unequal undivided shares, each person having an equal right to possess the whole property but no right of survivorship."  Black's Law Dictionary 1604 (9th ed. 2009).

[13]Once again, petitioners never put their agreement in writing, though William Holdner told his daughter that upon his death she would not inherit anything from the Holdner Farms operation.  Instead, William Holdner explained to his daughter that the farm operation would remain intact.  Petitioners apparently never considered what would happen to the properties in the event Randal Holdner predeceased his father.

Holdner Farms had developed two additional sources of income--
rental income from leasing parts of the jointly owned properties
(totaling $283,800 for 2004-2006) and income from logging the
Sattler property (totaling $869,116 for 2004-2006).[14]

Throughout 2004-2006 Randal Holdner managed Holdner Farms'
day-to-day operations, often working 16-18 hour days, while
William Holdner was primarily responsible for Holdner Farms'
finances and accounting.  William Holdner devoted approximately
50 percent of his professional time to Holdner Farms in 2004-
2006, and Randal Holdner devoted all of his worktime to Holdner
Farms.  During 2004-2006 petitioners shared equally in Holdner
Farms' gross income from cattle sales.  At some point before 2004
petitioners also agreed to share equally in Holdner Farms' gross
rental income and gross income from timber sales, and during
2004-2006 they divided these additional sources of income
equally.

Although petitioners never committed their revised agreement
to writing, petitioners took other steps in years preceding 2004
to formalize their business arrangement.  First, petitioners
created a separate bank account for Holdner Farms (the Holdner
Farms account), which was in existence throughout 2004-2006.
Each petitioner was an authorized signatory on the Holdner Farms
account and could sign checks and withdraw funds from the

[14]Petitioners reported their gain from timber sales on
Schedules D of their Federal income tax returns.

account.  Petitioners deposited all proceeds from cattle sales, rental activity, and timber sales into the Holdner Farms account, and they used the Holdner Farms account to pay most farm expenses.  Petitioners also took draws from the account.

Second, petitioners purchased an insurance policy for Holdner Farms.  When the policy required a rewrite in 2003, petitioners' insurance broker, Raymond Schumacher, who testified at trial, recommended that petitioners register Holdner Farms as a partnership for insurance purposes.  Petitioners accepted Schumacher's suggestion and purchased a commercial umbrella insurance policy.  The policy's declarations page describes the form of business insured as a partnership.

Finally, on January 23, 2003, petitioners registered Holdner Farms as a partnership with the State of Oregon.  Petitioners renewed the registration on December 14, 2004, and again on December 26, 2006.

V.   Petitioners' 2004-2006 Federal Income Tax Returns

In addition to his involvement with Holdner Farms, William Holdner maintained an active accounting practice in 2004-2006 which he conducted as a partnership with several other partners. On his Federal income tax returns for 2004, 2005, and 2006, William Holdner reported on Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., income from his accounting partnership of $264,516, $232,156, and $263,423, respectively.

William Holdner prepared his and his son's Federal income tax returns for 2004-2006. For 2004-2006 petitioners reported Holdner Farms' income and expenses from cattle sales and rental activity on Schedules F of their income tax returns, and they reported Holdner Farms' income and expenses from timber sales on Schedules D of the returns. Each petitioner effectively reported one-half of Holdner Farms' gross income.[15] However, William Holdner deducted most of Holdner Farms' expenses in 2004-2006 on his personal income tax returns for those years. As a result, William Holdner's income tax returns for 2004-2006 claimed net losses from his involvement in Holdner Farms, as illustrated by the following table:

|  | 2004 | | 2005 | | 2006 | |
|  | Randal Holdner | William Holdner | Randal Holdner | William Holdner | Randal Holdner | William Holdner |
|---|---|---|---|---|---|---|
| Cattle income | $138,966 | $138,966 | $91,695 | $91,695 | $250,405 | $250,405 |
| Rental income | 47,175 | 47,175 | 53,875 | [1]53,875 | 40,850 | [1]40,850 |
| Timber sales | 237,966 | 237,966 | 196,592 | 196,592 | -- | -- |
| Total income | 424,107 | 424,107 | 342,162 | 342,162 | 291,255 | 291,255 |
| Total expenses | 158,797 | 477,991 | 167,320 | 431,219 | 261,473 | 551,032 |
| Net gain (loss) | 265,310 | (53,884) | 174,842 | (89,057) | 29,782 | (259,777) |

[1]Both petitioners testified that they divided income from cattle sales, rental income, and timber sales generated by Holdner Farms equally during the years at issue, and their testimony is generally consistent with their tax returns. However, William Holdner, who prepared the tax returns, would sometimes report 100 percent of certain income (such as rental income in 2005 and 2006) and then claim an offsetting deduction for the 50-percent share owed

[15]In some instances, William Holdner reported 100 percent of Holdner Farms' gross income from a particular item on his returns and then deducted Randal Holdner's 50-percent share as an expense. On his 2004 Schedule F, for example, William Holdner reported $277,932 in sales of livestock and deducted $138,966 as cost or other basis. Similarly, on his 2004 return William Holdner reported $94,350 of rental income related to the Holdner Farms activity, and he deducted $47,175 as a rent or lease expense attributable to land.

to Randal Holdner.  Regardless of how the income was actually reported on the relevant returns, however, the net effect of petitioners' reporting positions is that all income from Holdner Farms was divided equally between them during the years at issue.  The above table reflects each petitioner's <u>net</u> share of the gross income generated by cattle sales, rentals, and timber sales.

In a few instances petitioners shared expenses in the same way they shared gains; i.e., 50-50.  In most instances, however, William Holdner allocated Holdner Farms' expenses between himself and his son as he saw fit.  Indeed, the allocation of Holdner Farms' expenses between petitioners did not bear any apparent relationship to petitioners' respective ownership interests in, or their respective levels of involvement with, Holdner Farms.  In fact, the allocation of expenses made by William Holdner had no apparent rational basis[16] and appeared completely arbitrary, as illustrated by the following table showing William Holdner's allocation of depreciation, interest, and animal feed expenses during the years at issue:

---

[16]William Holdner appeared to assert at trial that his allocation of expenses was related to his and Randal Holdner's respective investments in Holdner Farms and to their agreements regarding specific Holdner Farms expenses, although the testimony in question was often unclear and confused.  William Holdner's assertions are not substantiated in the record, and we reject them as self-serving and not credible.

Depreciation Expense

| | Randal Holdner | | William Holdner | |
|---|---|---|---|---|
| Year | Amount | Percentage | Amount | Percentage |
| 2004 | [1]$88,566 | 89 | $11,357 | 11 |
| 2005 | 12,907 | 21 | 49,710 | 79 |
| 2006 | 133,576 | 53 | 119,584 | 47 |

Interest Expense

| | Randal Holdner | | William Holdner | |
|---|---|---|---|---|
| Year | Amount | Percentage | Amount | Percentage |
| 2004 | $1,900 | 8 | $23,005 | 92 |
| 2005 | 28,276 | 49 | 29,180 | 51 |
| 2006 | 20,134 | 50 | 20,134 | 50 |

Animal Feed Purchased

| | Randal Holdner | | William Holdner | |
|---|---|---|---|---|
| Year | Amount | Percentage | Amount | Percentage |
| 2004 | -0- | -0- | $224,932 | 100 |
| 2005 | -0- | -0- | 118,338 | 100 |
| 2006 | $54,144 | 29 | 134,433 | 71 |

[1]All monetary amounts have been rounded to the nearest dollar, and all percentages have been rounded to the nearest whole number.

Following an examination of petitioners' returns for 2004-2006, respondent determined that Holdner Farms was a partnership for Federal income tax purposes and that petitioners were equal partners who must allocate partnership income and expenses accordingly. Respondent also determined that William Holdner was liable for the accuracy-related penalty under section 6662 for each of the years at issue. Petitioners timely filed petitions challenging respondent's determinations.

OPINION

## I. Evidentiary Matters

Respondent reserved objections to Exhibits 26-P through 33-P, which relate to respondent's examination of petitioners' 2004-2006 Federal income tax returns, on various grounds. Respondent objects to Exhibits 26-P through 31-P on the ground that they attempt to go behind the notice of deficiency. Respondent also objects to Exhibits 26-P, 27-P, 29-P, and 31-P through 33-P on the ground that they contain hearsay. Finally, respondent objects to Exhibit 32-P, an introductory letter from William Holdner to respondent's district counsel, on the ground that it is irrelevant.

A trial of a deficiency case in the Tax Court is a proceeding de novo. Our decision in a deficiency case is based on the record that is developed at trial, not on any previous record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974). Ordinarily, we do not go behind the notice of deficiency. Id. We have, however, recognized two limited exceptions to the general rule that we will not look behind the notice of deficiency. One is where there is substantial evidence of unconstitutional conduct by the Commissioner, and the other is in so-called naked assessment cases where the Commissioner introduces no evidence but rests on the presumption of

correctness and the taxpayer challenges the notice of deficiency on the grounds that it is arbitrary. Graham v. Commissioner, 82 T.C. 299, 308-309 (1984), affd. 770 F.2d 381 (3d Cir. 1985); see also United States v. Janis, 428 U.S. 433, 441 (1976).

Neither exception is applicable in these cases. Petitioners have not alleged that respondent engaged in unconstitutional conduct with respect to the determinations, and respondent does not rely solely on the presumption of correctness. Petitioners have not convinced us that the exhibits in question are relevant or otherwise admissible, and we hold that they are not. Respondent's objections to Exhibits 26-P through 31-P are sustained.

With respect to respondent's objections to Exhibits 32-P and 33-P on grounds of relevance and hearsay, we note that proceedings in the Tax Court are conducted in accordance with the Federal Rules of Evidence. See sec. 7453; Rule 143(a). Rule 402 of the Federal Rules of Evidence provides that all relevant evidence is admissible unless otherwise provided, and all evidence that is not relevant is not admissible. Relevant evidence is any evidence that has any tendency to make any fact of consequence to the determination of the action more or less probable than it would be without the evidence. Fed. R. Evid. 401. However, even relevant evidence may be excluded if its probative value is substantially outweighed by, inter alia,

"considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Id. 403.

Rule 801(c) of the Federal Rules of Evidence defines hearsay as any statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted.  Hearsay is not admissible, except as provided by the Federal Rules of Evidence, by other rules prescribed by the Supreme Court pursuant to statutory authority, or by Act of Congress.  Id. 802.

We agree with respondent that Exhibit 32-P, an introductory letter from William Holdner to respondent's district counsel, and Exhibit 33-P, a memorandum from William Holdner to the Appeals Office, are irrelevant.  Moreover, Exhibit 33-P is an advocate's document containing arguments and citations made by William Holdner during the consideration of his case by the Appeals Office.  To the extent Exhibit 33-P references financial information regarding Holdner Farms, most if not all of that information is already in evidence through other sources.  Consequently, we sustain respondent's objections to Exhibits 32-P and 33-P.

## II.  Burden of Proof

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer has the burden of proving that the determinations are incorrect.

Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In certain circumstances, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax, section 7491(a) shifts the burden to the Commissioner but only if the taxpayer establishes that he has complied with the requirements of section 7491(a)(2). See Weaver v. Commissioner, 121 T.C. 273, 275 (2003); Baker v. Commissioner, 118 T.C. 452, 461 (2002), affd. 338 F.3d 789 (7th Cir. 2003).

Petitioners have neither alleged that section 7491 applies nor established that they complied with the requirements of section 7491(a)(2) to substantiate items, to maintain required records, and to fully cooperate with respondent's reasonable requests. Nevertheless, petitioners argue that respondent's determinations are not entitled to the presumption of correctness. Although petitioners' argument is not entirely clear, petitioners appear to object to the fact that respondent has taken inconsistent positions by allocating 100 percent of the income from petitioners' Holdner Farms activity to both petitioners and disallowing all deductions even though respondent concedes that petitioners' Holdner Farms' expenses were substantiated. Petitioners' argument is without merit.

It is well established that the Commissioner may take inconsistent positions in order to protect the public fisc and

ensure against a potential whipsaw effect.[17]  Fayeghi v.

Commissioner, 211 F.3d 504, 508 n.3 (9th Cir. 2000), affg. T.C.

Memo. 1998-297; Centel Commcns. Co. v. Commissioner, 92 T.C. 612,

626 n.7 (1989) (citing Gerardo v. Commissioner, 552 F.2d 549,

555-556 (3d Cir. 1977), affg. in part and revg. in part T.C.

Memo. 1975-341, and Estate of Goodall v. Commissioner, 391 F.2d

775, 782-783 (8th Cir. 1968), vacating T.C. Memo. 1965-154),

affd. 920 F.2d 1335 (7th Cir. 1990); Doggett v. Commissioner, 66

T.C. 101, 103 (1976).  In Estate of Goodall v. Commissioner,

supra at 783, the Court of Appeals for the Eighth Circuit

explained the rationale behind allowing the Commissioner to take

inconsistent positions, stating:

> Inconsistency in determinations, when they are not made
> in bad faith, does not equate with an absence of the
> statutorily required determination, as the taxpayers
> suggest.  Each taxpayer, even though there are several
> related ones, by the determination and notice made for
> him, knows the position the Commissioner is taking with
> respect to his tax situation.  So long as the ultimate
> resolution of the issues is consistent for all, we see
> no legal wrong.

The same reasoning applies to this case.  To prevent a

potential whipsaw, respondent has taken inconsistent positions by

allocating 100 percent of Holdner Farms' income to each

petitioner and disallowing all expenses.  Respondent acted in

---

[17]"A whipsaw occurs when different taxpayers treat the same
transaction involving the same items inconsistently, thus
creating the possibility that income could go untaxed, or two
unrelated parties could deduct the same expenses on their
separate returns."  Maggie Mgmt. Co. v. Commissioner, 108 T.C.
430, 446 (1997).

good faith, respondent's determinations clearly informed each petitioner of respondent's position with respect to each petitioner's tax situation, and respondent seeks a consistent resolution for both petitioners; i.e., respondent concedes that only one-half of Holdner Farms' income should be allocated to each petitioner and that each petitioner should be allowed to deduct one-half of Holdner Farms' expenses.  We therefore reject petitioners' argument, and we conclude that petitioners have the burden of proof with respect to disputed factual issues in this case.

III. <u>Petitioners' Holdner Farms Activity Was a Partnership (or a Joint Venture Taxed as a Partnership) for Federal Income Tax Purposes</u>

The existence of a partnership for Federal income tax purposes is a question of Federal law and does not depend on whether an enterprise is recognized as a partnership under local law.  <u>Commissioner v. Culbertson</u>, 337 U.S. 733, 741 (1949); <u>Commissioner v. Tower</u>, 327 U.S. 280, 287-288 (1946); see also <u>Bergford v. Commissioner</u>, 12 F.3d 166, 169 (9th Cir. 1993), affg. <u>Alhouse v. Commissioner</u>, T.C. Memo. 1991-652; <u>Frazell v. Commissioner</u>, 88 T.C. 1405, 1412 (1987).  Section 7701(a)(2) defines a partnership as "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not  * * * a trust or estate or a

corporation". See also sec. 761(a) (defining a "partnership" the same way).[18] A partnership is created for Federal income tax purposes when persons join together their property, labor, or skill for the purpose of carrying on a trade, profession, or business and there is a community of interest in the profits and losses. Commissioner v. Tower, supra at 286. In Commissioner v. Culbertson, supra at 742, the Supreme Court identified the task that a court must undertake in deciding whether a partnership exists for Federal tax purposes:

> The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * * but whether, considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *

See also Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964).

Generally, each partner in a partnership contributes property or services, or both. Commissioner v. Culbertson, supra at 741.[19] In addition, a valid partnership is generally formed

---

[18]The definition of a partnership for Federal income tax purposes is basically the same as the definition of a partnership for commercial law purposes but more detailed. 1 Willis & Postlewaite, Partnership Taxation, par. 1.03[1], at 1-31 (6th ed. 2009).

[19]Where one partner contributes property and the other
(continued...)

with a business purpose--to conduct an enterprise for profit.

Madison Gas & Elec. Co. v. Commissioner, 633 F.2d 512, 514-517

(7th Cir. 1980), affg. 72 T.C. 521 (1979); Frazell v.

Commissioner, supra at 1412; see also Cusick v. Commissioner,

T.C. Memo. 1998-286; Estate of Winkler v. Commissioner, T.C.

Memo. 1997-4. Mere coownership of property does not create a

partnership for Federal income tax purposes, but coowners of

property may become partners if they carry on a business activity

for profit. Cusick v. Commissioner, supra; see also Estate of

Winkler v. Commissioner, supra.

We conclude that petitioners' Holdner Farms activity was a

partnership for Federal income tax purposes in 2004-2006 for

several reasons. First, both petitioners contributed capital and

labor to Holdner Farms. William Holdner contributed the

separately owned properties in 1977, as well as his 50-percent

share of the jointly owned properties as each was acquired, for

use in a farming operation with his son. Although the record

does not disclose whether Randal Holdner contributed any property

---

[19](...continued)
contributes services, a partnership is formed, but additional tax
complications may arise. See 1 McKee, et al., Federal Taxation
of Partnerships and Partners, par. 5.01, at 5-2 (4th ed. 2007).
For example, receipt of a partnership interest solely in exchange
for past services or anticipated future services does not qualify
for nonrecognition under sec. 721. Id. par. 5.02. Thus, the
value of a partnership interest received solely in exchange for
services may constitute gross income to the partner on receipt.
Id. Respondent does not raise any such issue with respect to
either petitioner for the years at issue.

to Holdner Farms in 1977, he contributed his 50-percent share of the jointly owned properties to Holdner Farms as the properties were acquired.  Moreover, both petitioners contributed labor to and performed services for Holdner Farms.  Randal Holdner has spent the past three decades managing the farming enterprise full time, while William Holdner has spent considerable time managing Holdner Farms' business affairs part time.

Second, Holdner Farms has conducted a business activity for profit since 1977 when it was formed.  From 1977 to the years at issue, Holdner Farms' farming operation grew steadily in scope and size and during 2004-2006 was active and profitable.  Petitioners correctly note that mere coownership of property or a joint undertaking to share expenses alone is not sufficient to satisfy the business activity requirement.  However, petitioners' Holdner Farms enterprise clearly was more than a mere coownership of property or a means to share expenses.

Third, petitioners shared Holdner Farms' gross income from cattle sales, timber sales, and rental income equally.  Randal Holdner testified that he did not regard his share of the income as salary or wages, and William Holdner apparently agreed, as he did not prepare a Form W-2, Wage and Tax Statement, or a Form 1099-MISC, Miscellaneous Income, for his son for any of the years at issue.  The record overwhelmingly demonstrates that Holdner

Farms was a business activity for profit that was jointly conducted by petitioners.[20]

An examination of the factors enumerated in Luna confirms our conclusion. In Luna v. Commissioner, supra at 1077-1078, we identified eight factors that are relevant to determining whether an enterprise is a partnership for Federal income tax purposes:

> [1] The agreement of the parties and their conduct in executing its terms; [2] the contributions, if any, which each party has made to the venture; [3] the parties' control over income and capital and the right of each to make withdrawals; [4] whether each party was a principal and coproprietor, sharing a mutual * * * obligation to share losses * * *; [5] whether business was conducted in the joint names of the parties; [6] whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; [7] whether separate books of account were maintained for the venture; and [8] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

Seven of the eight Luna factors support our conclusion that Holdner Farms was a partnership for Federal income tax purposes, and one factor neither supports nor weighs against it. First, petitioners agreed to split Holdner Farms' gross income from cattle sales, timber sales, and leasing activity, and they

---

[20]With respect to Holdner Farms' expenses, the record does not establish that petitioners agreed to or even discussed any specific division or allocation of Holdner Farms' expenses. The record does support a conclusion that William Holdner arbitrarily and unilaterally allocated farm expenses between himself and his son primarily to shelter William Holdner's other income, most particularly his substantial income from his accounting practice. That allocation was made on an annual basis without any apparent input from Randal Holdner.

faithfully executed this agreement. Second, both petitioners contributed capital and services to Holdner Farms. Third, petitioners had equal access to and control over the Holdner Farms account, and each petitioner had unlimited power to make withdrawals. Fourth, petitioners shared a mutual proprietary interest in Holdner Farms' profits, while petitioners' proprietary interest in Holdner Farms' losses, if any, is simply unclear. Fifth, the name "Holdner Farms", while ambiguous, suggested an enterprise that was not limited to one particular member of the Holdner family. Sixth, although petitioners did not file a Form 1065, U.S. Return of Partnership Income, on behalf of Holdner Farms, they represented to their insurer and to the State of Oregon that Holdner Farms was a partnership. Seventh, petitioners maintained a separate bank account for Holdner Farms, and William Holdner kept meticulous records for the enterprise. Finally, petitioners exercised mutual control over and responsibility for Holdner Farms. Although petitioners had different responsibilities, each played a crucial role in the enterprise, and each regarded himself as an owner. In summary, our examination of the Luna factors confirms our conclusion that Holdner Farms was a partnership for Federal income tax purposes.

Although petitioners' arguments are not entirely clear, petitioners appear to argue that their Holdner Farms' enterprise

was a joint venture between two individual proprietorships; i.e., between William Holdner's individual proprietorship and Randal Holdner's individual proprietorship. Petitioners call our attention to <u>Bialock v. Commissioner</u>, 35 T.C. 649 (1961), in which we held that a purported partnership between a taxpayer and his two minor children was not a valid partnership for Federal income tax purposes. Petitioners' argument is unavailing for several reasons.

First, the facts do not support petitioners' argument. There is no evidence, for example, that petitioners maintained separate bank accounts for their purportedly separate individual proprietorships, nor is there evidence that petitioners computed their gain and loss separately (other than for Federal income tax purposes). On the contrary, for the reasons discussed above, the record strongly indicates that petitioners regarded Holdner Farms as a single entity in which they each had an interest.

Second, the case cited in support of petitioners' argument is factually and legally distinguishable. In <u>Bialock</u>, the taxpayer planned to create a partnership among himself and two trusts established for the benefit of his two minor children, ages 9 and 15. <u>Bialock v. Commissioner</u>, <u>supra</u> at 650. The taxpayer planned to donate $2,500 to each trust in 1952 or 1953; the children were not expected to contribute any additional capital or any services to the partnership. <u>Id.</u> at 658.

However, the trusts were never created, and the taxpayer's minor children never contributed any capital or services to the enterprise.  Id. at 656, 658.  We therefore held that no partnership was formed because the parties did not in good faith and acting with a business purpose intend to join together in the present conduct of an enterprise.  Id. at 659.  By contrast, both petitioners made bona fide contributions of capital and labor to Holdner Farms, and both petitioners intended in good faith and with a business purpose to join together in the conduct of an enterprise.

Finally, even if we were to accept petitioners' argument that Holdner Farms was a joint venture of two individual proprietorships, we would still conclude that Holdner Farms was a partnership for Federal income tax purposes.  A joint venture "has been defined as a 'special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation,' and also as 'an association of persons to carry out a single business enterprise for profit.'"  Beck Chem. Equip. Corp. v. Commissioner, 27 T.C. 840, 848-849 (1957) (citing 48 C.J.S. Joint Adventures, secs. 1 and 2, Estate of Koen v. Commissioner, 14 T.C. 1406 (1950), and Osborn v. Commissioner, 22 B.T.A. 935, 945 (1931)).  The existence of a joint venture "is a question of fact to be determined by reference to the same principles that govern

the question of whether persons have formed a partnership * * * for tax purposes." Luna v. Commissioner, 42 T.C. at 1077. "[T]here are four basic attributes which are indicative of a joint venture: (1) A contract, express or implied, that a joint venture be formed; (2) the contribution of money, property and/or services by the venturers; (3) an agreement for joint proprietorship and control; and (4) an agreement to share profits." S. & M. Plumbing Co. v. Commissioner, 55 T.C. 702, 707 (1971). A joint venture may create a separate entity for Federal income tax purposes if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom. Sec. 301.7701-1(a)(2), Proced. & Admin. Regs.; see also Allum v. Commissioner, T.C. Memo. 2005-177, affd. 231 Fed. Appx. 550 (9th Cir. 2007).

Even if Holdner Farms were a joint venture rather than a partnership, the joint venture would create a separate entity for Federal income tax purposes because petitioners carried on a farming business. Sec. 301.7701-1(a)(2), Proced. & Admin. Regs. As a domestic separate entity with at least two members, Holdner Farms would be treated as a partnership for Federal income tax purposes unless petitioners elected for the enterprise to be taxed as a corporation. Sec. 301.7701-3(b)(1)(i), Proced. & Admin. Regs. Petitioners did not file an election with respect to Holdner Farms. Thus, even if petitioners are correct that

Holdner farms was a joint venture, the activity would still be treated as a partnership for Federal income tax purposes.

IV.  Petitioners Were Equal Partners in Holdner Farms in 2004-2006 and Must Allocate Expenses Equally

Partnerships are not subject to tax as such.  Sec. 701. Persons carrying on business as partners are liable for tax only in their separate and individual capacities.  Id.  To determine income tax liability, each partner shall take into account his distributive share of partnership income, gain, loss, deduction, and credit.  Sec. 702(a).  A partner's distributive share of income, gain, loss, deduction, and credit is determined by the partnership agreement.  Sec. 704(a).  If the partnership agreement does not state how a partner's distributive share of income, gain, loss, deduction, or credit is to be determined, or if the allocation provided in the partnership agreement does not have substantial economic effect, the partner's distributive share shall be determined according to the partner's interest in the partnership.  Sec. 704(b).

A partner's interest in a partnership refers to the manner "in which the partners have agreed to share the economic benefit or burden * * * corresponding to the income, gain, loss, deduction, or credit (or item thereof) that is allocated."  Sec. 1.704-1(b)(3)(i), Income Tax Regs.  A partner's interest in a partnership is determined by taking into account all the facts and circumstances.  Sec. 704(b); Vecchio v. Commissioner, 103

T.C. 170, 193 (1994); sec. 1.704-1(b)(3)(i), Income Tax Regs. Partners are presumed to have equal per capita interests in the partnership. Sec. 1.704-1(b)(3)(i), Income Tax Regs.[21] However, the presumption may be rebutted by the taxpayer or the Commissioner by establishing that the partners' interests in the partnership were other than equal. Id.

In determining the partners' interests in the partnership, the following factors are relevant: (1) The partners' relative contributions to the partnership, (2) the partners' respective interests in partnership profits and losses, (3) the partners' relative interests in cashflow and other nonliquidating distributions, and (4) the partners' rights to capital upon liquidation. Sec. 1.704-1(b)(3)(ii), Income Tax Regs.; see also Estate of Ballantyne v. Commissioner, T.C. Memo. 2002-160, affd. 341 F.3d 802 (8th Cir. 2003). An examination of these factors supports respondent's argument that petitioners have presented insufficient evidence to rebut the presumption of equal partnership interests and that, therefore, petitioners must allocate both income and expenses equally.

---

[21]Sec. 1.704-1(b)(3)(i), Income Tax Regs., was amended in 2008. T.D. 9398, 2008-1 C.B. 1143. The regulation as amended no longer contains the presumption that all partners' interests in a partnership are equal, on a per capita basis. See id., 2008-1 C.B. at 1146-1147. Sec. 1.704-1(b)(3)(i) as amended by T.D. 9398, supra, applies to partnership taxable years beginning on or after May 19, 2008. Id., 2008-1 C.B. at 1147. Accordingly, the amended regulation does not apply to this case. We apply the version of sec. 1.704-1(b)(3)(i), Income Tax Regs., in effect for the years at issue.

A.   Petitioners' Contributions to Holdner Farms

The first factor requires an examination of petitioners' relative contributions to Holdner Farms.  At trial William Holdner estimated that he had contributed approximately $2.5 million to Holdner Farms since its formation and that Randal Holdner had contributed approximately $800,000, but he did not introduce any documentation to support his estimates.  Relying solely on his self-serving estimates, he argued that he should be treated as owning a 75-percent interest in Holdner Farms.  Neither petitioner quantified his contribution of labor to Holdner Farms.

William Holdner's estimate of his and Randal Holdner's capital contributions to Holdner Farms since 1977 is unsupported by any documentation in the record or by corroborating testimony.  Petitioners did not maintain capital accounts for Holdner Farms, nor did they offer evidence concerning the relative values of the separately owned properties or the jointly owned properties at the time they were contributed to Holdner Farms.  Moreover, William Holdner's estimate fails to account for his son's contribution of services to Holdner Farms.  The record strongly suggests that Randal Holdner regarded his decades of work for Holdner Farms as "sweat equity", and he worked 16-18 hour days on the farm in part because he believed he had an equity interest in it.

Perhaps the most telling problem with petitioners' argument is that it is inconsistent with their own tax accounting. Petitioners contend that William Holdner, as a 75-percent partner, was entitled to 75 percent of Holdner Farms' losses, but William Holdner's actual share of Holdner Farms' total expenses, as reported on petitioners' 2004-2006 Federal income tax returns, ranged from 67.8 percent to 75.1 percent, and his share of Holdner Farms' gross income was only 50 percent. A closer look at petitioners' treatment of particular items only makes matters more confusing: For example, William Holdner deducted 11.4 percent of Holdner Farms' depreciation and section 179 expenses in 2004, 79.4 percent in 2005, and 47.2 percent in 2006. Petitioners have presented no credible evidence of any special allocations that would adequately explain these variations.

We simply cannot estimate petitioners' relative contributions to Holdner Farms solely on the basis of evidence that is inconsistent, unsubstantiated, and self-serving. Thus, we conclude that petitioners have failed to rebut the presumption of equal partnership interests with respect to this factor.

B. Petitioners' Respective Interests in Holdner Farms' Profits and Losses

The second factor requires us to examine petitioners' relative interests in Holdner Farms' economic profits and losses. Petitioners had equal interests in Holdner Farms' gross income in 2004-2006 and previous years, but petitioners' relative interests

in Holdner Farms' expenses is less clear. For tax purposes, the allocation of Holdner Farms' expenses between petitioners that William Holdner made each year was heavily weighted in his favor. However, the record suggests that William Holdner did not bear the economic burden of the disproportionate allocation of farm expenses. The record reveals that all farm expenses during 2004-2006 were paid from farm revenue, which as we know was divided equally between petitioners. Consequently, we believe that the economic reality of petitioners' arrangement is that petitioners bore the economic burden of farm expenses equally despite the disproportionate allocation of expenses reflected on the tax returns William Holdner prepared for 2004-2006. We therefore conclude that petitioners have failed to rebut the presumption of equal partnership interests with respect to this factor.

C. Petitioners' Relative Interests in Cashflow and Other Nonliquidating Distributions

The third factor we consider is petitioners' relative interests in cashflow and other nonliquidating distributions. The record establishes that petitioners had equal interests in Holdner Farms' cashflow and nonliquidating distributions. During 2004-2006 petitioners were entitled to draws from the Holdner Farms account. Petitioners each also had an unlimited right to withdraw funds from the Holdner Farms account at any time. The only limit on petitioners' rights to withdraw funds from the Holdner Farms account was their apparent agreement not to

overdraw it.  Petitioners did not offer any evidence that either of them exercised greater control over cashflow and nonliquidating distributions than the other.  Moreover, there is no evidence that Holdner Farms ever made a disproportionate distribution to either partner.  Thus, we conclude that petitioners had an equal interest in Holdner Farms' cashflow and nonliquidating distributions.

    D.    <u>Petitioners' Rights to Capital Upon Liquidation</u>

Finally, petitioners offered no credible evidence regarding their rights to liquidating distributions from Holdner Farms. Although petitioners agreed that the entire Holdner Farms enterprise would be devised to Randal Holdner upon the death of William Holdner, petitioners apparently never considered how the property used in the enterprise would be distributed in the event that Holdner Farms were liquidated while both partners were still alive.  Randal Holdner testified that he believed he had an interest in the separately owned properties as early as 1977, and that belief seems to be supported by the fact that income generated by timbering on one of the separately owned properties was divided equally between petitioners.  However, like many parts of the record, the testimony on this point was vague and uncertain and not sufficient to rebut the presumption of equal partnership interests.

We conclude on the basis of the entire record that respondent properly determined that Holdner Farms was a partnership for Federal income tax purposes and that in the absence of substantial proof rebutting the presumption of equality, petitioners had equal interests in partnership income, expenses, and other partnership items.

V.    Section 6662 Accuracy-Related Penalty

Section 6662(a) and (b)(1) authorizes the Commissioner to impose an accuracy-related penalty equal to 20 percent of the underpayment attributable to negligence or disregard of rules or regulations.  For purposes of section 6662, negligence is any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and disregard includes any careless, reckless, or intentional disregard.  Sec. 6662(c); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985) (negligence is lack of due care or failure to do what a reasonable and prudent person would do under the circumstances); sec. 1.6662-3, Income Tax Regs.  Negligence also includes any failure to exercise ordinary and reasonable care in the preparation of a tax return or any failure to keep adequate books and records and to properly substantiate items.  Sec. 1.6662-3(b)(1), Income Tax Regs.  Negligence is strongly indicated where, inter alia, "A taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction * * * which would

seem to a reasonable and prudent person to be 'too good to be true' under the circumstances". Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. A return position that has a reasonable basis is not attributable to negligence. Sec. 1.6662-3(b)(1), Income Tax Regs. A reasonable basis standard is a relatively high standard that is significantly higher than a not frivolous standard. Sec. 1.6662-3(b)(3), Income Tax Regs. The reasonable basis standard is not satisfied where a return position is merely arguable or colorable. Id.

Section 6662(a) and (b)(2) authorizes the Commissioner to impose a 20-percent penalty if there is a substantial understatement of income tax.[22] An understatement of tax is the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax actually shown on the return. Sec. 6662(d)(2)(A). In the case of an individual, a substantial understatement is an understatement that exceeds 10 percent of the tax required to be shown on the return for the taxable year, or $5,000, whichever is greater. Sec. 6662(d)(1)(A). However, the amount of an understatement is reduced to the extent the taxpayer has "substantial authority" for the position taken. Sec. 6662(d)(2)(B)(i). Substantial

---

[22]Only one sec. 6662 accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one of the types of conduct listed in sec. 6662(b). New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. 161, 187 (2009); sec. 1.6662-2(c), Income Tax Regs.

authority is an objective standard requiring an analysis of the law and an application of the law to the relevant facts.  Sec. 1.6662-4(d)(2), Income Tax Regs.

The Commissioner bears the initial burden of production with respect to a taxpayer's liability for the section 6662 penalty; i.e., the Commissioner must first produce sufficient evidence to establish that imposition of the section 6662 penalty is appropriate.  Sec. 7491(c); Kikalos v. Commissioner, 434 F.3d 977, 986 (7th Cir. 2006), affg. T.C. Memo. 2004-82.  If the Commissioner satisfies his initial burden of production, the burden of producing evidence to refute the Commissioner's evidence shifts to the taxpayer.  See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

Respondent has satisfied his burden of production with respect to negligence by establishing that William Holdner failed to make a reasonable attempt to comply with the Code.  Specifically, respondent has established that William Holdner failed to make a reasonable attempt to ascertain the correctness of his reporting positions with respect to Holdner Farms.  As a practicing accountant with decades of experience, William Holdner knew that a disproportionate allocation of Holdner Farms' expenses to him would allow him to shelter hundreds of thousands of dollars in unrelated income.  William Holdner did not introduce any credible evidence that he acted reasonably in doing

so or that he conducted any research on the proper classification of Holdner Farms for tax purposes before he decided to prepare the 2004-2006 returns as he did.  Although petitioners assert that William Holdner is not liable for the section 6662 accuracy-related penalties, their arguments amount to little more than a recitation of arguments we have previously rejected, e.g., Holdner Farms was, in fact, two individual proprietorships, petitioners never formed a partnership, etc.  Because we conclude that William Holdner is liable for the 20-percent accuracy-related penalty for negligence, we need not consider whether he is also liable for the section 6662 penalty for a substantial understatement.

## VI.  Conclusion

We have considered the parties' other arguments, and to the extent not discussed herein, we conclude the arguments are irrelevant, moot, or without merit.  In summary, we hold that Holdner Farms was a partnership for Federal income tax purposes in 2004-2006.  Further, we hold that petitioners were equal partners in the partnership during the years at issue and that Holdner Farms' income, expenses, and other partnership items must be allocated accordingly.  Finally, we hold that petitioner William Holdner is liable for the section 6662 accuracy-related penalty for 2004-2006.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.